**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

**LEWIS CLARK TIERNEY, III,**
355 East 72nd Street, 5A, New York, NY 10021,

**CHRISTOPHER SCOTT TIERNEY,**
2875 S. York St., Denver, CO 80210,

**LEE MOUNTCASTLE KENNA TIERNEY**
13826 Lilac Street, Thornton, CO 80607,

**ESTATE OF CAROLYN K. TIERNEY
GRIESEMER, Katherine K. Combs, PR,**
1194 Breakers West Blvd., West Palm Beach,
FL 33411,

**CAROL KENNA TIERNEY GST TAX
EXEMPT TRUST, Katherine Combs, TTEE,**
2101 E. 7th Avenue Parkway, Denver, Colorado
80206, and

**CAROLYN KENNA TIERNEY TRUST,
Katherine Kenna Combs, TTEE,**
1194 Breakers West Blvd., West Palm Beach,
FL 33411, each Individually and Derivatively on
behalf of The Tierney Corporation and The
Leatherwood Company,

|  | Case No. ___21-1714___ |
|---|---|

**JURY TRIAL DEMANDED**

        Plaintiffs,

    v.

**BARCLAY DEWET,** Individually and in
her capacity as a director and officer of The
Tierney Corporation and The Leatherwood Co.
505 9th Street NW, #1000,
Washington D.C. 20004,

**LAWRENCE SMITH,** Individually and
in his capacity as a director of The Tierney
Corporation,
505 9th Street NW, #1000,
Washington D.C. 20004,

**PEYTON TIERNEY,** Individually and in his
capacity as a director and officer of the
Companies,

1

505 9th Street NW, #1000,
Washington D.C. 20004,

**ANN TIERNEY SMITH**, Individually and as a
former director and officer of the Companies,
505 9th Street NW, #1000,
Washington D.C. 20004,

**DOUGLAS WOLOSHIN,** Individually and in
his capacity as counsel to, and a director and
officer of, the Companies,
505 9th Street NW, #1000,
Washington D.C. 20004

**DUANE MORRIS, LLP,** a Delaware limited
liability partnership;
505 9th Street NW, #1000,
Washington D.C. 20004, and

**THE TIERNEY CORPORATION,** a West
Virginia corporation, a nominal defendant,
505 9th Street NW, #1000,
Washington D.C. 20004,

**THE LEATHERWOOD COMPANY**, a West
Virginia  corporation, a nominal defendant,
505 9th Street NW, #1000,
Washington D.C. 20004

Defendants.

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiffs, Lewis Clark Tierney, III ("Lewis Tierney"), Christopher Scott Tierney, Lee

Mountcastle Kenna Tierney, the Estate of Carolyn Kenna Tierney Griesemer, Carolyn Kenna

Tierney GST Tax Exempt Trust, and  Carolyn Kenna Tierney Trust, Katherine Combs Trustee

(collectively, "Plaintiffs"), individually and derivatively on behalf of nominal defendants, The

Tierney Corporation ("The Tierney Corporation") and The Leatherwood Company ("The

Leatherwood Company" together, "Companies"), by counsel, bring this Verified Shareholder

Derivative Complaint (the "Action") and allege as follows:

2

**NATURE AND SUMMARY OF THE ACTION**

1.     Arising from the operative facts as alleged in detail herein, this is a shareholder derivative action brought on behalf of The Tierney Corporation, a closely-held family corporation, and The Leatherwood Company, its subsidiary, against certain members of the Companies' Boards of Directors (the "Board"), certain of their executive officers (the "Officers") and/or the Companies' legal counsel, Duane Morris LLP ("Duane Morris") and Doug Woloshin (collectively, "Defendants"), seeking to remedy breaches of fiduciary duties and material misrepresentations that have caused significant harm to the Companies and their long-term viability. As discussed in further detail below, the events underlying this Action are the product of more than 20 years of self-dealing and usurpation of corporate assets for the personal benefit of the Companies' Executive Committee members, including the Companies' President, her immediate family members, and the family attorney, Doug Woloshin. Despite the clear conflict of interest arising from Defendant Woloshin's representation of both the Companies and the Companies' President in her individual capacity, Mr. Woloshin orchestrated a transaction whereby the Companies traded their most valuable income-producing property (a Walgreens in West Palm Beach, Florida) to the Companies' President in exchange for a property with significantly less value (an old, run-down horse farm). Indeed, despite the fact that the horse farm was worth *less than one third* of the value of the Walgreens, Mr. Woloshin and Duane Morris made objectively false representations to various Board members that the two properties were equal in value. Relying on Mr. Woloshin's misrepresentations, the Companies approved the exchange, damaging the Companies in an amount exceeding $3.8 million. Of course, no action has been taken to remedy this egregious conduct because those with the power to take action (the Companies' past and present Executive Committee, who represent three of the five available Board seats) have greatly benefited from this transaction (and others). At every turn, the Companies' Executive Committee have taken steps to

consolidate their power and isolate themselves from any liability or accountability. Plaintiffs bring this action to end the cycle of self-dealing at the highest echelons of the Companies' authority and to recover what rightfully belongs to the Companies' shareholders.

2.      As discussed, beginning in 2001 and continuing to the present, certain of the Defendants (or close relatives of the Defendants), have managed the Companies for their own personal interest and profit to the detriment of the Companies and the shareholders.

3.      The Tierney Corporation and The Leatherwood Company are nominal defendants only. They are named as defendants because this is a derivative action by shareholders, as authorized by, *inter alia*, Rule 23.1 of the Federal Rules of Civil Procedure.

4.      This Action is related, but not identical, to another derivative action currently pending in the Circuit Court of Kanawha County, West Virginia – Civil Action No. 18-C-90 (the "2018 Action"). To provide a brief procedural overview: in 2017, Plaintiffs brought a derivative complaint in West Virginia against certain Board/Executive Committee members, including Doug Woloshin, Ann Tierney Smith, and Matt Tierney, based on their self-dealing, corporate waste, misuse of corporate assets, and other misconduct. The defendants moved to dismiss the complaint, arguing that Plaintiffs were required to make a demand on the Board pursuant to West Virginia Rule of Civil Procedure 23.1 (which language largely mirrors that of Federal Rule of Civil Procedure 23.1). Plaintiffs argued that any demand made on the Board would be futile, but the Court disagreed and dismissed the case, finding Plaintiffs were required to make a demand on the Board. Plaintiffs did so and re-filed the derivative action in 2018 with the same allegations (the 2018 Action). Following Plaintiffs' demand and lawsuit, the Companies launched an investigation into Plaintiffs' claims (Plaintiffs note that the investigation process was flawed and Plaintiffs are currently working through those defects via the 2018 Action – as of the filing of this Action, Plaintiffs have sought relief from the West Virginia Circuit Court seeking access to certain

corporate documents to assess the legitimacy of the Companies' questionable investigation). However, during the course of the Companies' investigation, certain new facts were revealed to Plaintiffs. Those new facts, discovered only recently, serve as the basis for this Action. Thus, Plaintiffs bring this separate suit to assert new causes of action, against mostly new Defendants, based on new facts discovered after filing of the 2018 Action.

5.     Most notably, and as discussed above, in 2009, the Companies engaged in a like-kind exchange with the Companies' President at the time, Ann Tierney Smith. The exchange involved a horse farm owned by Ann Tierney Smith located in Tazewell County, Virginia for a Walgreens owned by the Companies in West Palm Beach, Florida (the "horse farm transaction"). The Walgreens was one of the most, if not the most, profitable properties in the Companies' portfolio. Counsel for the Companies, Duane Morris and Mr. Woloshin[1], consistently represented to various Board members that the two properties were of equal value. In support of his position, Mr. Woloshin regularly cited to a 2006 appraisal of the horse farm conducted by Cushman & Wakefield (the "Appraisal"). While it is true that the Appraisal valued the horse farm at $5.2 million, such valuation was premised on, *inter alia*, an "extraordinary assumption" that there was **$20.65 million in completed infrastructure on the property**, making it ready for development. Duane Morris and Mr. Woloshin concealed that critical detail from the Board by either misrepresenting the contents of the Appraisal for some Board members or completely withholding the Appraisal from others (namely the Plaintiffs). Relying on the representations of Duane Morris and Mr. Woloshin as to the value of the property, the horse farm transaction was approved by the Leatherwood Board and the Executive Committee of the Tierney Corporation. Unbeknownst to the Plaintiffs, the horse farm transaction damaged the Companies in an amount of at least $3.8

---

[1] Critically, Mr. Woloshin has at all relevant times served as the personal attorney for Ann Tierney Smith and her family.

million dollars as the horse farm's real value, absent the $20.65 million infrastructure investment, was only $1.4 million. It was **not** worth the $5.2 million represented by Mr. Woloshin. Recently, after more than a decade of requests, Plaintiffs finally obtained a copy of the Appraisal that had been improperly withheld by Duane Morris and Mr. Woloshin, revealing their fraudulent and negligent misrepresentations.

6.      The horse farm transaction greatly benefited Ann Tierney Smith and her family. It is therefore unsurprising that two of the current Board members, President Barclay deWet and Lawrence Smith, who are Ann Tierney Smith's children, have been complicit in helping to cover up the self-dealing by their mother.

7.      Plaintiffs bring this Action to remedy this injustice and to recoup damages for the benefit of all the Companies' shareholders, not just the select few in positions of power.

8.      Pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, each of the Plaintiffs asserts that (i) he or she was a shareholder or member at the time of the transaction of which the Plaintiffs complain, and (ii) the action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

## JURISDICTION AND VENUE

9.      The Court has subject matter jurisdiction over this Action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and the Action is between citizens of different States. As discussed in greater detail below, this shareholder derivative action involves fraud, negligence, and breaches of fiduciary duty, which have proximately resulted in damages exceeding $3,800,000 for the Companies.

10.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the District of Columbia. The Companies' primary office is located in the District of Columbia and thus, the

Companies transact much of their business in the District of Columbia. The Companies' counsel, Defendant Doug Woloshin, is based in Duane Morris' office in the District of Columbia. Mr. Woloshin is a member of the District of Columbia bar. The misrepresentations and other misconduct by Mr. Woloshin that form the basis of this Action were made in the District of Columbia and thus, the damages to the Companies occurred in the District of Columbia.

## THE COMPANIES' HISTORY, FAMILY RELATIONSHIPS, AND THE OFFICERS / DIRECTORS OF THE COMPANIES

11.     Tierney Corporation has its origins in two companies owned and operated by Colonel Laurence E. Tierney, Sr. from the early 1900s until being sold during World War II.  Col. Tierney owned the Tierney Land Company and Tierney Mining Company in Stone, Kentucky, and was involved in the management of many other coal and fuel entities in the region.  Following his death and over time, the Company was involved in a variety of businesses including owning and operating radio and television entities in Charleston, West Virginia, under the leadership of Col. Tierney's younger son, Lewis Tierney.

12.     Since its formation in the early 1900s, Tierney Corporation has been a closely-held family corporation. Through its recent history, Tierney Corporation is primarily owned by three families. Of the 21,931 total shares, Ann Tierney Smith and family (including her children Barclay deWet and Lawrence Smith) own 27 percent; C. Matthew S. Tierney ("Matt Tierney") and family (including his son Peyton Tierney) own 21 percent; and L. Clark Tierney, Jr. ("Clark Tierney") and family (including the Plaintiffs) own 21 percent. The three families together own 69.3 percent of the company. All remaining shares are held by other shareholders, with none owning more than 4.11 percent.

13.     Tierney Corporation also owns 62 percent of The Leatherwood Company, with the remaining 38 percent owned by Ann Tierney Smith and her family. Historically, The Leatherwood

Company, formerly known as The Leatherwood Land Company, has had operations in the dairy business and generally operates in a manner similar to The Tierney Corporation.

14.    In the 1990s, Clark Tierney (father to Plaintiff Lewis Tierney) served as President of Tierney Corporation and oversaw both Companies with involvement from his cousin, Ann Tierney Smith, and his younger brother, Matt Tierney, on the Executive Committee. The Companies were incredibly important to Clark Tierney, who sought to ensure the long-term viability and success of the Companies so that his family (both immediate and extended) could benefit from the continued income for the rest of their lives. Clark Tierney ran the Companies equitably and for the benefit of all three families (and all shareholders). Each family had equal representation on the Board and Executive Committee.

15.    In 2000, Clark Tierney passed away, and thus began the struggles that lead Plaintiffs here today. Following Clark Tierney's passing, Ann Tierney Smith and Matt Tierney immediately seized power for themselves (to the exclusion and detriment of Clark Tierney's family, represented by Plaintiffs, and the other shareholders). For example, after Clark Tierney passed away, he was replaced on the Board of the Tierney Corporation by his wife, Carolyn Kenna Tierney Griesemer ("Carol Griesemer"). However, she was not allowed a spot on the Leatherwood Company Board, she was not allowed a spot on the Executive Committee, and she did not receive a salary or any health benefits (the salary and benefits that Ann Tierney Smith and Matt Tierney gave themselves grew to over $350,000 per year). Carol Griesemer's exclusion from the Executive Committee was especially significant as most of the Companies' decisions were (and still are) made by the Executive Committee as opposed to the full Board. Thus, instead of having equal family representation on the Board and Executive Committee, Ann Tierney Smith, in furtherance of her bid to seize control of the Companies for her own benefit, appointed to the Board and the Executive Committee her personal attorney, Doug Woloshin. This set the stage for multiple

decades of self-dealing, and over the years, Ann Tierney Smith, Matt Tierney, and Doug Woloshin engaged in *quid pro quos* whereby they exchanged benefits for one another at the expense of the shareholders.

16.     The pretext for Carol Griesemer's exclusion from the Executive Committee and Leatherwood Board was that she was not "of Tierney blood," but that rationale is belied by the facts: Mr. Woloshin, who obviously is not a member of the Tierney family in any capacity, was appointed in Carol Griesemer's place. Moreover, as discussed immediately below, upon Matt Tierney's retirement from the Executive Committee and Board in 2016, he was replaced by his wife Patricia Tierney, who, like Carol Griesemer, was "not of Tierney blood."

17.     Ann Tierney Smith served as President of the Boards of both Companies and on the Executive Committee from 2000 until her retirement in December 2017. She was replaced by her daughter, Barclay deWet. Matt Tierney retired from the Boards of both Companies and the Executive Committee in October 2016 and was replaced by his wife, Patricia Tierney. Patricia Tierney was replaced on the Boards of both Companies and the Executive Committee by her son, Peyton Tierney January 8, 2020. The children of Ann Tierney Smith and Matt Tierney have continued the legacy of self-dealing started by their parents.

18.     Carol Griesemer served on the Board of the Tierney Corporation from 2001 until she was replaced by her son, Plaintiff Lewis Tierney, in 2016. Lewis Tierney represents the shares originally owned by Clark Tierney on the Board today.

19.     The Tierney Corporation Board is currently composed of five members, three of whom are also Executive Committee officers. The Executive Committee members – who possess a significant amount of control (if not total control) over the company – are Defendants Doug

Woloshin, Barclay deWet, and Peyton Tierney. The two additional Board members, who are not on the Executive Committee, are Defendant Lawrence Smith and Plaintiff Lewis Tierney.

20.     The Board of Leatherwood Company is composed of Defendants Doug Woloshin, Barclay deWet, and Peyton Tierney.

21.     Mr. Woloshin has never been a shareholder of Tierney Corporation. Although Tierney Corporation's by-laws require that Board members must be company shareholders, over the last 20+ years, Ann Tierney Smith (and now her children and those of Matt Tierney) have spearheaded efforts to waive the bylaws so that Mr. Woloshin can serve as both a Board member to both Companies and an Executive Committee member, ensuring that the cycle of self-dealing at the top of the Companies' chain of command can continue. Of course, as discussed above, Mr. Woloshin also was and is Ann Tierney Smith's personal family attorney. Thus, Mr. Woloshin simultaneously serves as Ann Tierney Smith's personal attorney, Board member of both Companies, Executive Committee member, and outside counsel to both Companies. These clear conflicts of interest serve as a large contributing factor to the events underlying this Action as Mr. Woloshin prioritized his loyalty to Ann Tierney Smith over his loyalty to the Companies.

22.     The focus of the Tierney Corporation and Leatherwood Company has been to diversify revenue away from coal with the hope that the next generation of shareholders would continue to benefit from the Companies. Efforts at diversification have involved investing in revenue-producing real estate, medical technology, opening two upscale restaurants, and creating a commercial and residential development.

23.     However, these investments and opportunities, where made, have been compromised by the Defendants' self-dealing, corporate mismanagement, and waste. The best revenue-producing assets have been traded away, to the detriment of the shareholders in favor of Ann Tierney Smith, Matt Tierney, and their families. Most notably, as discussed in further detail

below, was the horse farm transaction. Mr. Woloshin has played a key role throughout, helping to facilitate deals like the horse farm transaction. In exchange, Ann Tierney Smith and Matt Tierney approved payments of a grossly and excessively disproportionate percentage of the Companies' revenue for legal fees for the personal benefit of Mr. Woloshin and Duane Morris. At times, more than *50 percent* of the Companies' entire revenues went to pay Duane Morris' legal fees.

## THE PARTIES

24.     Plaintiff Lewis Tierney is and was at all times relevant a shareholder of The Tierney Corporation stock. Since February 2016, Lewis Tierney has been a member of the Board of Directors of The Tierney Corporation.  Lewis Tierney currently resides in New York, New York.

25.     Plaintiff Christopher Tierney is and was at all times relevant a shareholder of Tierney Corporation stock.  Christopher Tierney currently resides in Denver, Colorado.

26.     Plaintiff Lee Mountcastle Kenna Tierney is and was at all times relevant a shareholder of Tierney Corporation stock.  He currently resides in Thornton, Colorado.

27.     Plaintiff the Estate of Carolyn Kenna Tierney Griesemer is and was at all times relevant a shareholder of Tierney Corporation stock. The estate is probated in Denver, Colorado.

28.     Plaintiff Carolyn Kenna Tierney GST Tax Exempt Trust, Katherine Kenna Combs, TTEE, is and was at all times relevant a shareholder.

29.     Plaintiff Carolyn Kenna Tierney Trust, Katherine Kenna Combs, TTEE, is and was at all times relevant a shareholder of Tierney Corporation stock.

30.     Nominal defendant The Tierney Corporation is a corporation organized and existing under the laws of West Virginia with its principal executive offices located at 505 9th Street, N.W., Suite 1000, Washington, D.C. 20004.

31.     Nominal defendant The Leatherwood Company is a corporation organized and existing under the laws of West Virginia with its principal office executive offices located at 505 9th Street, N.W., Suite 1000, Washington, D.C. 20004.

32.     Defendant Barclay deWet has served as President and Executive Committee member of the Companies since December 2017. She is the daughter of Ann Tierney Smith and sister of Lawrence Smith.

33.     Defendant Lawrence Smith has served on the Board of the Tierney Corporation since January 2019. He is the son of Ann Tierney Smith and brother of Barclay deWet.

34.     Defendant Peyton Tierney has served on the Board of the Companies since January 2020. He is the son of Matt Tierney and Patricia Tierney. Upon information and belief, he is a resident of Lexington, Kentucky.

35.     Defendant Ann Tierney Smith is a former President and Executive Committee member of the Companies. She is the mother of Barclay deWet and Lawrence Smith.

36.     Defendant Woloshin has served as Executive Director of The Tierney Corporation and a member of the Board since 2000, although he has never been a shareholder of the Company. Mr. Woloshin, an attorney and member of the District of Columbia bar, has been the managing partner of the Washington, D.C. office of defendant Duane Morris since 2004.  At all times relevant, Mr. Woloshin has also served as Ann Tierney Smith's personal family lawyer and as outside legal counsel to the Companies.  Upon information and belief, Mr. Woloshin is a resident and citizen of Arlington, Virginia.

37.     Defendant Duane Morris is an international law firm headquartered in Philadelphia, Pennsylvania. Since 2006 to the present, Duane Morris, through its attorney Mr. Woloshin, has provided legal services to The Tierney Corporation and The Leatherwood Company.  During this time, despite the Companies having no mergers, acquisitions, or other

significant legal proceedings, legal expenses charged by Duane Morris have been, at a minimum, 24.3 percent of the Company's total revenue. In 2014, legal expenses reached to a staggering 51.3 percent of total revenue without any reasonable justification for the expense. Most recently, actual legal expenses charged by Duane Morris have been in excess of 645 percent of the budgeted annual legal expenses (as estimated by Mr. Woloshin).

## ALLEGATIONS GIVING RISE TO THE 2018 ACTION

38.     As stated above, this Action is related to another derivative action currently pending in West Virginia Circuit Court (Kanawha County) – Civil Action No. 18-C-90 – the 2018 Action.

39.     The 2018 Action asserts seven counts, premised largely on breaches of fiduciary duty, gross negligence, mismanagement, self-dealing, and corporate waste by Ann Tierney Smith, Matt Tierney, Doug Woloshin, and Duane Morris.

40.     Among other allegations, the 2018 Action asserts that the Tierney Corporation is a non-complex holding company that receives passive revenue from a small number of assets and does not require day-to-day management from the Companies' Officers.  Instead, third-party specialists, like UBS, manage the Companies' stock portfolios. These professional services are completely outsourced to third-party legal and financial advisors.  Despite outsourcing the entire operation, Officers Ann Tierney Smith and Matt Tierney each paid themselves an annual salary of **$295,000** as executive compensation, and in addition, they each received additional benefits totaling **$65,000**, including healthcare and a pension. Neither Ann Tierney Smith nor Matt Tierney did anything to merit such excessive compensation. Neither had any prior business background or other qualifications/abilities that would support $350,000+ in annual compensation. Nor did either regularly perform services or devote even a moderate amount of time to Company matters. Indeed, as discussed, the Companies derive their income from largely passive sources with operations outsourced to third parties. Mr. Woloshin and Duane Morris also performed some duties to assist

13

in the operation of the Companies (though, as discussed below, not nearly enough to justify the excessive legal fees they collected over the years). The Board met once per year. That does not justify $350,000 in annual compensation but simply serves as further evidence of the self-dealing and bleeding of corporate assets by Ann Tierney Smith and Matt Tierney.[2]

41.     Ann Tierney Smith, with the assistance of Mr. Woloshin and Matt Tierney, also engaged in improper self-dealing based on a flawed valuation of the horse farm property. As discussed above, in 2009, the Companies engaged in the horse farm transaction, exchanging the West Palm Beach Walgreens for the horse farm. Mr. Woloshin represented numerous times that the properties were equal in value. Specifically, the value of the horse farm was premised on the 2006 Cushman & Wakefield Appraisal. At the time of the 2018 Action, Plaintiffs did not have access to the Appraisal, despite repeated requests, as it was improperly withheld by Mr. Woloshin, Ann Tierney Smith, and Matt Tierney. Thus, the allegations in the 2018 Action were premised on the fact that the valuation of the horse farm was stale (occurring in 2006, prior to the collapse of the real estate market). Moreover, in May 2006, Ann Tierney Smith caused the Companies to pay her $600,000 up front for an option to purchase the horse farm property ***despite the fact that there were no bids or other interest in the property from anyone else***. The $600,000 option was thus unreasonable and effectively just an excuse for Ann Tierney Smith (and family) to take $600,000 from the Companies. The option to purchase the horse farm and like-kind exchange of the property took place without a vote by the Tierney Corporation Board. As the Plaintiffs had been excluded

---

[2] And, Barclay deWet and Peyton Tierney have carried on their parent's tradition, paying themselves at a minimum (as of 2018) $150,000 per year in annual compensation. Plaintiffs only have data from 2018 as that is the most recent annual report released by the Companies, in contravention of basic accounting and corporate governance principles. Upon information and belief, they also receive healthcare benefits.

from the Leatherwood Board and the Executive Committee, Plaintiffs did not have any say or insight into these self-dealing transactions.

42.     Duane Morris and Mr. Woloshin also engaged in excessive overbilling. Despite the fact that the Companies' revenues have been derived largely from passive sources, Duane Morris and Mr. Woloshin billed millions of dollars in legal fees over the years, including a number of years where legal fees were significantly more than $1 million and reached a staggering 51.3 percent of the Tierney Corporation's total annual revenue.

43.     Plaintiffs bring this separate suit to assert new causes of action based on new facts discovered after filing of the 2018 Action.

### PLAINTIFFS' DEMAND AND THE COMPANIES' INVESTIGATION

44.     Shortly before filing the 2018 Action in West Virginia Circuit Court, on January 26, 2018, Plaintiffs made a demand on the Board to investigate Plaintiffs' allegations. Plaintiffs made a similar demand on the Companies' shareholders.

45.     Following Plaintiffs' demand, Barclay deWet hired a third-party law firm – Dinsmore & Shohl LLP ("Dinsmore") – to investigate the allegations. In contravention of basic corporate governance procedures, neither Plaintiffs nor the Board were consulted during the process of selecting the investigator or providing the scope of the investigation, which upon information and belief was handled exclusively by the Executive Committee (composed of Ms. deWet, Mr. Woloshin, and Patricia Tierney). It is unclear where the Executive Committee derived the authority to act on its own without any input from the Board.

46.     On May 19, 2020, over two years after Plaintiffs' demand, following a review of relevant documents and interviews with *some but not all* of the relevant individuals, Dinsmore completed a 72-page report to Barclay deWet (the "Dinsmore Report").

47.     Critically, the Dinsmore Report found "reasonable minds could conclude that Ann Tierney Smith *improperly* benefitted from the horse-farm transaction at the expense of Leatherwood…" (emphasis added). The Dinsmore Report recognized that the horse farm was valued at $5,200,000 only after satisfaction of an "extraordinary assumption" upon which the valuation was premised: installation of more than $20,600,000 in infrastructure so that the property could be developed. The Dinsmore Report further recognized that at the time the horse farm transaction was approved by the Board, none of the anticipated $20,600,000 in infrastructure had been completed. As the Dinsmore Report aptly summed up: "nothing had been built." Of course, absent the $20,600,000 infrastructure investment upon which the Appraisal was premised, the horse farm was not worth the $5,200,000 valuation as if such infrastructure were in place. Again, the Dinsmore Report noted: "the 2006 appraisal's assumption that $20.6 Million in development would be completed by May 13, 2008, and thereby cause the horse-farm to be worth $5.2 Million, was no longer accurate at the time the exchange was approved." Thus, as discussed below, Ann Tierney Smith (and her family, including Barclay deWet and Lawrence Smith), assisted by Duane Morris and Mr. Woloshin, *unquestionably* benefitted from the horse farm transaction at the expense of the Companies' shareholders. However, ultimately, Dinsmore recommended that the Companies not pursue the claims because in Dinsmore's view, they would not survive the statute of limitations or the safe harbor rule. While Plaintiffs respectfully disagree with Dinsmore's finding, such findings are not applicable to the new causes of action asserted in this Action. Indeed, the causes of action asserted in the 2018 Action, which were investigated by Dinsmore, are different than those asserted in the present Action.

48.     Immediately after the Dinsmore Report was released, on May 20, 2020, Ms. deWet wrote a letter to the Companies' shareholders urging them to vote to dismiss Plaintiffs' claims. Ms. deWet did not provide a copy of the Dinsmore Report, nor did she disclose the wrongdoing

16

that had occurred involving her mother, her uncle, and her family attorney. Instead, Ms. deWet

provided shareholders with a cursory summary of the Dinsmore Report, noting that:

> Dinsmore's report concludes that the plaintiff's allegations are flawed and recommends
> that the stockholders reject the plaintiff's demand and the companies move to dismiss the
> lawsuit. The investigation uncovered no fraud, concealment, or other intentional
> wrongdoing. Dinsmore observes that even if some claims could technically be pursued,
> any potential recovery is far outweighed by the risks and expenses associated with
> litigation, would distract from the companies' core business operations, and would destroy
> the companies' longstanding and valuable relationship with Duane Morris. I agree with our
> independent counsel's conclusion that pursuing this lawsuit is not in the companies' best
> interests and agree that the companies should therefore ask the Court to dismiss the case.

That's it. Ms. deWet did not provide the Dinsmore Report, she did not disclose the self-dealing

that tremendously benefitted her mother and family, she did not disclose other findings made by

Dinsmore that reflect very poorly on Duane Morris and Mr. Woloshin, and she did not provide

shareholders an opportunity to question Dinsmore or otherwise ask follow-up questions to discuss

Dinsmore's findings. Upon information and belief, Ms. deWet had the support and assistance of

the Executive Committee in drafting and sending this communication.

49.    Moreover, in the same letter to the shareholders, Ms. deWet also called for a

shareholder vote on May 30, 2020 (a period of 10 days, the fewest number of days permitted before

such a vote) recommending dismissal of the claims. Ms. deWet included a proxy which, again,

failed to disclose material information necessary for the shareholders informed consideration of

the situation at issue. A few shareholders (two in particular) requested that the vote be delayed

until the shareholders could read and review the Dinsmore Report, but the request was denied and

the vote proceeded. Upon information and belief, Ms. deWet had the support and assistance of the

Executive Committee in crafting/employing this strategy to rush through the shareholder vote and

not allowing the shareholders to review the Dinsmore Report or ask any follow-up questions. The

shareholders, being uninformed of all the operative facts, voted not to pursue Plaintiffs' claims.

(Also of note is that the Defendants' families account for 48.6 percent of all shares).

50.     Immediately after the shareholders' meeting, on May 31, 2020, the Board (the very same Board running the Companies today) convened and voted to seek dismissal of Plaintiffs' claims. As stated above, Plaintiffs believe the investigation process, and the decision not to pursue the 2018 Action, were highly flawed. Those facts are currently being worked out in the West Virginia Circuit Court and are not presently the source of the counts asserted in this Action. But, the investigation shed light on new facts, not previously known to Plaintiffs, and new causes of action, which are the subject of this Action.

51.     Indeed, it was through Dinsmore's investigation that Plaintiffs were finally able to obtain a copy of the Appraisal that had been fraudulently concealed from Plaintiffs by the Board, Executive Committee, Mr. Woloshin, and Duane Morris for more than a decade.

**THE HORSE FARM TRANSACTION AND THE APPRAISAL**

52.     In October 2006, the Companies commissioned the Appraisal of Ann Tierney Smith's horse farm, which Cushman & Wakefield then delivered in November 2006.

53.     The Appraisal valued the horse farm at approximately $5,200,000 as of the valuation date (May 13, 2008).

54.     The Appraisal was subject to a number of "Extraordinary Assumptions." The Appraisal notes that the Uniform Standards of Professional Appraisal Practice defines extraordinary assumption as follows: "an assumption, directly related to a specific assignment, which, if found to be false, could alter the appraiser's opinions or conclusions. Extraordinary assumptions presume as fact otherwise uncertain information about physical, legal or economic characteristics of the subject property…"

55.     Most notably, the Appraisal was subject to the following extraordinary assumption: "The appraisal is subject to the completion of the infrastructure in accordance with the description included in our report. It is further assumed that the completion of the infrastructure will occur in

a timely manner and that the quality of workmanship will be consistent [with] area standards. If the infrastructure design or quality differs from that which was considered herein, our value conclusions could be impacted." The Appraisal goes on to state: "We have been asked to value the subject property 'Upon Completion of the Infrastructure.' We were given a construction cost budget indicating that these costs were expected to total approximately $20,600,000. Since we are estimating the subject's value at a point in time when the infrastructure is assumed to be in place (May 2008), *these costs were not included in our discounted cash flow analysis*." (emphasis added). Specifically, the construction cost budget contemplated *$20,648,750* in infrastructure costs. Of course, without $20.65 million worth of infrastructure actually in place, the horse farm property was **not** worth anything close to the $5.2 million at which the Appraisal had it valued. Plaintiffs enlisted the services of an independent appraiser who opined that absent the $20.65 million infrastructure investment, the horse farm property was worth $1,454,483.

56.     Moreover, in valuing the horse farm property, the Appraisal used the development approach. The development approach has been called into question as it is highly speculative, prone to error, and reflects the highest price a developer can afford to pay for the land and still earn the desired profit (instead of the actual value).

57.     Moreover, the Appraisal relied on re-zoning of the property that had not occurred at the time of valuation. The contemplated re-zoning, which would allow for commercial development of the property, also increased the valuation in the Appraisal.

58.     Mr. Woloshin owed a duty to inform the Board of the meaning of the Appraisal. Instead, Mr. Woloshin misrepresented the contents of the Appraisal and induced the Board's reliance thereon for the benefit of his personal client, Ann Tierney Smith, and her family. Specifically, Mr. Woloshin routinely stated that the value of the horse farm was $5.2 million when, in fact, that was not the value of the horse farm. The horse farm was worth far less than that.

59.     On June 20, 2007, Mr. Woloshin sent Matt Tierney a letter providing an explanation of the Appraisal. Upon information and belief, Mr. Woloshin represented in this letter that the value of the horse farm was $5.2 million and Mr. Woloshin did not disclose the extraordinary assumption upon which that valuation was premised.

60.     On September 25, 2009, Mr. Woloshin sent Matt Tierney an email regarding the Appraisal, the like kind exchange process, and options to purchase. The letter specifically included an analysis and evaluation  of the current value of the West Palm Beach Walgreens. In the letter, Mr. Woloshin again misrepresented the value of the horse farm property, stating "On November 26, 2006, Ann's Property was appraised at a value of $5,200,000 as of May 13, 2008 by Cushman & Wakefield." Mr. Woloshin did not mention the extraordinary assumption upon which that valuation was premised and he did not state that the horse farm property was not actually worth $5,200,000 on May 13, 2008. Instead, Mr. Woloshin represented that the horse farm was actually worth $5,200,000, that the Companies had already paid Ann Tierney Smith $600,000 for the option to purchase the horse farm, and that the Companies needed to find a way to pay the $4,600,000 balance. Mr. Woloshin then explained the like-kind exchange process and identified certain properties as potential candidates, including a CVS in Port St. Lucie, Florida (worth approximately $1.39 million), a Walgreens in Belton, Missouri (worth approximately $2.6 million), and the West Palm Beach Walgreens (worth approximately $4.6 million). Mr. Woloshin suggested the two possibilities were to either exchange the West Palm Beach Walgreens or both the CVS and the Belton Walgreens.

61.     On October 6, 2009, Mr. Woloshin faxed Matt Tierney a summary of the terms that would be discussed with respect to exchanging the horse farm for the Walgreens. Such summary specifically stated that the horse farm would be acquired for the remaining value of $4.6 million

(again, a misrepresentation as to the real value of the horse farm), which would be funded by exchange of the Walgreens property.

62.     Plaintiffs were unaware of the above interactions prior to release of the Dinsmore Report.

63.     Matt Tierney had no knowledge of real estate, appraisals, extraordinary assumptions, or other indicators of property value. He relied on counsel to the Companies, Duane Morris and Mr. Woloshin, to explain the proposed transaction to him. Mr. Woloshin's misstatements and omissions were at best negligent (by failing to understand the meaning of the extraordinary assumption in the Appraisal) and at worst fraudulent (by intentionally misrepresenting its contents). Either way, Mr. Woloshin breached his duties to inform himself of the Appraisal's meaning and to convey complete and accurate information to the Companies regarding such meaning.

64.     Ann Tierney Smith knew her property was not worth $5.2 million but she took no action to remedy Mr. Woloshin's misrepresentations. Instead, she colluded with and encouraged Mr. Woloshin to make such misrepresentations.

65.     On October 7, 2009, based on the collusion of Ann Tierney Smith and Doug Woloshin, and Matt Tierney's failure to adequately inform himself, the Leatherwood Board voted to approve the horse farm transaction. The horse farm transaction was also approved by the Executive Committee of the Tierney Corporation. This resulted in a loss of at least $3.8 million to the Companies (paying $5.2 million for a property worth only $1.4 million).

66.     On October 9, 2009, the Companies held the annual Directors Meeting. During this meeting, Board member Carol Griesemer (in the presence of the other Board members, Ann Tierney Smith, Matt Tierney, and Clayton Rogers) questioned Mr. Woloshin about the horse farm transaction and the valuation of the horse farm, but Mr. Woloshin continued his parade of

concealment and misrepresentations. And, despite owing a duty to the contrary, Ann Tierney Smith did nothing to correct Mr. Woloshin's misrepresentations as to the value of her property.

67.     Specifically, the Board meeting transcript, which details the interchange between Mr. Woloshin and Carol, provides in part as follows:

- Carol asked: "My, my question revolves around a comparison, of the value of the appraisal of Ann's property, versus a current appraisal of the value of the Wal-Green's, in West Palm. And, I don't know what, what your current, if we have a current appraisal on that…we're basing this decision making on….And so what is the value, then, that you were able to determine for that property?"

    Mr. Woloshin responded "Approximately $4,600,000" (in reference to the Walgreens).

- Mr. Woloshin continued: "the transaction, was based on, at that time, based on an appraisal, that was performed, and, that value was being measured against an industry standard, sales methodology. So, the values are considered comparable." This was a misrepresentation. The values were not comparable as the Walgreens was at least three times more valuable.

- The exchange continued with Carol asking whether there was a purchase price associated with the horse farm, and Mr. Woloshin stating that the purchase price was based on the appraisal ($4.6 million).

68.     Moreover, Carol also stated "I'd like to see a copy of the…Cushman and Wakefield appraisal please. And any other documentation that you have, that you all based your decision on." Thus, Carol sought to do her due diligence related to the horse farm transaction. But Mr. Woloshin, knowing that the Appraisal completely undermined the valuation he had represented to the Board as to the horse farm, refused to produce the Appraisal. In response to Carol's question, Mr. Woloshin responded "Noted." That prompted the following exchange, where Carol stated "Thank you. When can I expect to receive that?" and Mr. Woloshin responded: "I'm saying 'noted.' I have

to discuss that with, with, the directors of, of Leatherwood." The Directors of Leatherwood were, of course, Ann Tierney Smith and Matt Tierney (in addition to Mr. Woloshin). Mr. Woloshin, Ann Tierney Smith, and Matt Tierney never produced the Appraisal. Indeed, why would they, as it revealed the fraud being committed on the Companies.

69.     While the Tierney Corporation Board was never given an opportunity to vote on the horse farm transaction (as it had already been approved by the Executive Committee, consisting of Mr. Woloshin, Ann Tierney Smith, and Matt Tierney), had the true contents of the Appraisal not been fraudulently concealed, Carol Griesemer and other Board members and/or shareholders could have (and would have) taken action to stop the horse farm transaction.

70.     Plaintiff Lewis Tierney also requested a copy of the Appraisal when he joined the Board in October 2016 (and after). Ann Tierney Smith, Ms. deWet, Mr. Woloshin, Duane Morris, and other Board members refused to provide it.

71.     Plaintiffs finally received and were able to access a copy of the Appraisal during the course of Dinsmore's investigation. (Unsurprisingly, the Appraisal was not provided by Duane Morris, Mr. Woloshin, or Ms. deWet, as the Appraisal reveals the true nature of their self-dealing at the expense of the shareholders). Rather, Dinsmore provided a copy of the Appraisal.

72.     In sum, the Appraisal assumed completion of $20.65 million worth of infrastructure. That meant, in order for the horse farm property to be worth the $5.2 million at which it was appraised, there needed to be $20.65 million in completed infrastructure in place. ***Someone*** had to invest $20.65 million to complete the infrastructure. If the Companies were to do it, they would be out $20.65 million (and actually more as the Companies did not have the cash on hand to make such an investment and would have been required to finance it). Alternatively, if those costs were passed on to a prospective developer, the developer would of course factor such a massive investment into the purchase price of the property. Meaning, there is no way a developer

would both finance the $20.65 million infrastructure investment *and* pay $5.2 million for the property (which, as the Appraisal noted, would only be worth $5.2 million if the infrastructure were already in place). But the Defendants cared nothing for that. They were more interested in using the Companies as their won personal piggy bank. They could and did enrich themselves at the expense of all other shareholders of the Companies. Plaintiffs will not let this injustice stand.

## DEMAND ON THE COMPANIES' DIRECTORS AND SHAREHOLDERS WOULD BE FUTILE

73.     After becoming a Board member of Tierney Corporation in February 2016, Plaintiff Lewis Tierney became aware of the Executive Committee's misuse of corporate assets and their disregard of mandatory procedures required by the Companies' by-laws. In October 2016, Lewis Tierney attempted to schedule a meeting with the Executive Committee at the time (comprised of Ann Tierney Smith, Matt Tierney, and Doug Woloshin) to convey his findings and express his concerns, but he never heard back regarding his request. Despite Lewis Tierney's attempt to spur the prior Executive Committee to provide redress, his efforts were ultimately (and, due to the Executive Committee's wrongdoing and self-dealing, unsurprisingly) unsuccessful. This led to the filing of a complaint in 2017. In the 2017 complaint, the Plaintiffs alleged that any demand made on the Board would be futile. The Companies argued against futility and the Court ruled that the Plaintiffs needed to make a demand on the Board and shareholders. So, on January 26, 2018, Plaintiffs made their demand. Of course, predictably, Plaintiffs were correct that demand was futile and following investigation of the Plaintiffs' demand, more than two years later, the Companies' shareholders and the Board decided not to pursue Plaintiffs' claims.

74.     No different result can be expected this time around. As discussed, Plaintiffs have already made a demand on the Board and shareholders of the Companies for similar, albeit different, causes of action. But even though the causes of action are different, this Action is based

on the same operative facts that (in theory) were already considered by the Board and shareholders prior to their vote not to pursue Plaintiffs' 2018 claims. Essentially, the Plaintiffs made a demand based on certain facts available to them at the time (in 2018), the Companies investigated Plaintiffs' demand, the investigation uncovered additional facts demonstrating wrongdoing by the Defendants, the Board recommended that Plaintiffs' claims not be pursued, the shareholders voted not to pursue the claims, and the Board (comprised of the same exact Board members sitting today) voted to seek dismissal of Plaintiffs' suit. So, while the new facts discovered during the investigation give rise to new causes of action that are asserted in this Action (but not previously asserted), the shareholders/Board have (in theory) already considered the underlying facts and voted not to pursue claims based on the facts. There is no reason to jump through any additional hoops and waste another two years for the Companies to investigate these new causes of action, during which time the statute of limitations on any claims would expire anyway. Demand in this case is futile for this reason alone.

75.      Moreover, this Board cannot be trusted to act in an independent and unbiased manner to investigate its own wrongdoing and the wrongdoing of immediate family members, especially when the Board stands to benefit from such wrongdoing. Indeed, the Board has already shown that it will not act to protect the interests of the shareholders, choosing instead to protect their own interests and those of their family. Effectively, every action taken by the Companies over the last two decades has been to elevate and solidify the power of two families – those of Ann Tierney Smith and Matt Tierney – to the detriment and exclusion of Clark Tierney's family (represented by the Plaintiffs).

76.      Four members of the five member Board are defendants to this Action and are accused of wrongdoing and/or self-dealing. Ms. deWet and Lawrence Smith are siblings and their mother, Ann Tierney Smith, is also at the center of the alleged wrongdoing and a Defendant in this

Action. These types of close family relationships have consistently been found to call into question a board member's independence and ability to remain objective. That is even more true when both Ms. deWet and Lawrence Smith have or will benefit financially from the horse farm transaction.

77.     The Board also has been antagonistic towards Plaintiffs, and specifically Lewis Tierney. Mr. Woloshin has on numerous occasions shouted at Lewis Tierney while Ms. deWet consistently ignores basic corporate governance requests.

78.     Another factor that must be considered is Mr. Woloshin's consistent presence and domination of the Board. Mr. Woloshin has been involved with the Companies for decades. He holds both Board and Executive Committee positions (and has done so for decades). He is intimately involved in running the Companies as the remaining Board members (Plaintiff Lewis Tierney excluded) know little or nothing about running a business. Thus the Board, and especially the Executive Committee, are totally reliant on Mr. Woloshin. Moreover, Mr. Woloshin has served as the Smith family attorney for decades (Ann Tierney Smith, Ms. deWet, and Lawrence Smith all falling under that umbrella). The current Board members (Lewis Tierney excluded) have gone to great lengths to protect Mr. Woloshin and keep him in his position atop the Companies' hierarchy. A majority of the Board is beholden to Mr. Woloshin and the Board has shown time and again it is unwilling to hold him accountable for his actions.

79.     Moreover, as a recent and prime example of why demand would be futile – the defendants in the 2018 Action recently submitted to the West Virginia Circuit Court for approval a settlement agreement purporting to settle both the 2018 Action and all other claims that could be brought at this time. The Board was never consulted about such a settlement agreement. The shareholders were never consulted about such a settlement agreement. Plaintiffs were never consulted about such a settlement agreement. Indeed, it appears that Ms. deWet and/or the Executive Committee negotiated on their own with Defendants Woloshin and Duane Morris. This

is just the latest example in a long line of examples dating back many years where Ms. deWet and/or her family/the Executive Committee have circumvented incredibly basic corporate governance policies and just acted on their own to accomplish whatever they want whenever they want. They view the Companies as things to be used for their own benefit and they have no regard for the rights or interests of anyone else, including the shareholders.

80.     All of these serve as independent grounds for finding that any demand made on the shareholders and/or Board would be futile.

81.     Plaintiffs, who jointly represent the shares originally owned by Clark Tierney on the Board, fairly and adequately represent the interests of the shareholders similarly situated in enforcing the Companies' rights. Plaintiffs have the capacity to vigorously and conscientiously prosecute this derivative action and are free from economic interests that are antagonistic to the interests of the shareholders. Indeed, Plaintiffs' interests are aligned with those of the shareholders as Plaintiffs seek to correct wrongdoing by the Defendants that has resulted in substantial pecuniary and other losses to the Companies.

## COUNT I
## FRAUDULENT MISREPRESENTATION
### (against Defendants Woloshin and Duane Morris)

82.     Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 81 with the same force and effect as if fully set forth here.

83.     Mr. Woloshin and Duane Morris made multiple intentional, knowing material misrepresentations to Board members of the Companies regarding the contents of the Appraisal and the value of Ann Tierney Smith's horse farm. Specifically, at the very least, Mr. Woloshin and Duane Morris made such misrepresentations to Matt Tierney on September 25, 2009, and to Carol Griesemer and Clayton Rogers on October 9, 2009.

84.     The representations made by Mr. Woloshin and Duane Morris were false and known to be false.

85.     Moreover, Mr. Woloshin and Duane Morris fraudulently concealed the true contents of the Appraisal from Plaintiffs for more than a decade, despite a duty to disclose the truth.

86.     Matt Tierney, Carol Griesemer, and Clayton Rogers reasonably relied on Mr. Woloshin's and Duane Morris' representations as they were outside counsel to the Companies.

87.     The Companies have been damaged by such reliance in an amount to be proven at trial but exceeding $3.8 million.

## COUNT II
## NEGLIGENT MISREPRESENTATION
**(against Defendants Woloshin and Duane Morris)**

88.     Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 87 with the same force and effect as if fully set forth herein.

89.     Mr. Woloshin and Duane Morris made multiple representations to Board members of the Companies regarding the contents of the Appraisal and the value of Ann Tierney Smith's horse farm. Those representations turned out to be false and were based on Mr. Woloshin's apparent misunderstanding of the Appraisal and the extraordinary assumptions upon which it was premised.

90.     The Companies and Plaintiffs relied on the representations of Mr. Woloshin and Duane Morris to their detriment.

91.     The Companies were damaged by such reliance in an amount to be proven at trial but exceeding $3.8 million.

## COUNT III
## BREACH OF CONTRACT AND IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against Defendants Woloshin and Duane Morris)

92.     Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 91 with the same force and effect as if fully set forth here.

93.     From 2001 to the present, Mr. Woloshin and Duane Morris have acted as outside legal counsel to the Companies, establishing a contractual attorney-client relationship, whether express or implied (the "Agreement").

94.     The Agreement is a valid and enforceable contract supported by adequate consideration.

95.     All conditions precedent to the enforcement of the Agreement have been satisfied.

96.     The Companies have performed their obligations under the Agreement, and have paid the (excessive) legal fees billed pursuant to the Agreement.

97.     Contrary to the terms of the Agreement and professional standards of conduct, Mr. Woloshin and Duane Morris have violated their duties to the Companies by making misrepresentations and causing the Companies to enter into the horse farm transaction, which damaged the Companies in an amount exceeding $3.8 million.

98.     Mr. Woloshin and Duane Morris' acts, as described above, constitute a material breach of Agreement and the contractual duties owed to the Companies.

99.     Mr. Woloshin and Duane Morris have not cured their breach.

100.    As a direct and proximate result of Mr. Woloshin's and Duane Morris' material breach of the Agreement, the Companies have suffered an actual loss and are entitled to damages in an amount to be determined at trial.

## COUNT IV
## AIDING AND ABETTING FRAUD
### (against Defendant Ann Tierney Smith)

101.     Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 100 with the same force and effect as if fully set forth here.

102.     Defendant Doug Woloshin made misrepresentations regarding the value of the horse farm to Matt Tierney, Carol Griesemer, and Clayton Rogers that caused the Companies significant harm.

103.     Ann Tierney Smith was aware of the falsity of Doug Woloshin's representations (and indeed, conspired with and encouraged Mr. Woloshin to make such misrepresentations).

104.     Ann Tierney Smith owed fiduciary obligations to the Companies, including duties to act in good faith and in the best interests of the Companies. She had a duty to disclose the fact that Mr. Woloshin's representations regarding the value of her property were inaccurate and artificially inflated.

105.     Instead, Ann Tierney Smith remained silent and did not make such disclosures to Matt Tierney on or before the Leatherwood Board's approval of the horse farm transaction on October 7, 2009, nor did she make such disclosures to Carol Griesemer or Clayton Rogers at the October 9, 2009 Board meeting of the Companies.

106.     By encouraging Mr. Woloshin to misrepresent the value of the horse farm and by remaining silent when such misrepresentations were made to other Board members, Ann Tierney Smith knowingly and substantially assisted in Mr. Woloshin's misrepresentation.

107.     Ann Tierney Smith's actions (or failure to act) caused the Companies harm.

## COUNT V
## CIVIL CONSPIRACY
### (against Defendants Woloshin, Duane Morris, and Ann Tierney Smith)

108.     Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 107 with the same force and effect as if fully set forth here.

109.     Ann Tierney Smith colluded with her personal attorney, Mr. Woloshin and Duane Morris, to create a windfall.

110.     Mr. Woloshin/Duane Morris and Ann Tierney Smith agreed to participate in the unlawful misrepresentation to the Board as to the value of the horse farm.

111.     The misrepresentations made by Doug Woloshin caused significant harm to the Companies.

112.     The misrepresentations to the Board were made in furtherance of the scheme to get Ann Tierney Smith cash.

## COUNT VI
## REMOVAL OF DIRECTORS
### (against Defendants Woloshin, deWet, Lawrence Smith, and Peyton Tierney)

113.     Plaintiffs repeat and reallege each allegation contained in paragraphs 1 through 112 with the same force and effect as if fully set forth here.

114.     As set forth above, the actions taken by the Board and Executive Committee over the last two decades have been to consolidate power and benefit two families – those of Ann Tierney Smith and Matt Tierney – at the expense and exclusion of Clark Tierney's family (represented by the Plaintiffs) and the shareholders.

115.    The existing Board members (Plaintiff Lewis Tierney excluded) have engaged in fraudulent conduct, grossly abused their positions of power, and inflicted harm on the Companies for their own personal benefit.

116.    Removal of these Board members – Defendants Woloshin, deWet, Lawrence Smith, and Peyton Tierney – is in the best interest of the Companies, whose long-term viability is in serious question based on the actions (and inactions) of the Defendants.

## PRAYER FOR RELIEF

**WHEREFORE**, based on the foregoing, Plaintiffs demand judgment as follows:

A.    Granting judgment against each defendant in favor of The Tierney Corporation and The Leatherwood Company for the amount of damages sustained by The Tierney Corporation and The Leatherwood Company as a result of the misconduct by each defendant;

B.    Granting judgment against each defendant in favor of The Tierney Corporation and The Leatherwood Company for all consequential damages suffered by the Companies;

C.    Granting judgment against defendants in favor of the Tierney Corporation and The Leatherwood Company for punitive damages;

D.    Ordering that Defendants Woloshin, deWet, Lawrence Smith, and Peyton Tierney be removed from the Board and barred from reelection;

E.    Awarding to Plaintiffs the costs and disbursements of this action, including reasonable attorney's, accountants' and experts' fees, and costs and expenses; and

F.    Granting such other and further relief as the Court may deem just and proper.

Respectfully submitted,

By /s/ Andrew C. Crawford
Benjamin G. Chew (D.C. Bar No. 418577)
Andrew C. Crawford (D.C. Bar No. 1032080)
Brown Rudnick LLP
601 13th Street NW, Suite 600
Washington, DC 20005
(202) 536-1785
(617) 289-0717
BChew@brownrudnick.com
ACrawford@brownrudnick.com

*Attorneys for Plaintiffs*

Dated: June 28, 2021

**VERIFICATION**

I verify under penalty of perjury that the foregoing is true and correct. Executed on
6/28/2021.

LEWIS CLARK TIERNEY, III

## VERIFICATION

I verify under penalty of perjury that the foregoing is true and correct. Executed on

6/28/21     .

**CHRISTOPHER SCOTT TIERNEY**

## VERIFICATION

I verify under penalty of perjury that the foregoing is true and correct. Executed on
06|28|21 .

LEE MOUNTCASTLE KENNA TIERNEY

## VERIFICATION

I verify under penalty of perjury that the foregoing is true and correct. Executed on
June 28, 2021.

*Carolyn Kenna Tierney, GST Tax Exempt Trust*

*Katherine Kenna Combs, TTEE*

**CAROLYN KENNA TIERNEY GST TAX EXEMPT TRUST,**
**Katherine Kenna Combs, TTEE**

## **VERIFICATION**

I verify under penalty of perjury that the foregoing is true and correct. Executed on June 28, 2021.

**ESTATE OF CAROLYN K. TIERNEY GRIESEMER,**
**Katherine K. Combs, PR**

**VERIFICATION**

I verify under penalty of perjury that the foregoing is true and correct. Executed on
June 28, 2021.

**CAROLYN KENNA TIERNEY TRUST,**
Katherine Kenna Combs, TTEE