**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | | |
|---|---|---|---|
| CHRISTOPHER SCOTT TIERNEY, et al., | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 21-cv-1714 (RC) |
| | : | | |
| v. | : | Re Document No.: | 54, 55, 56, 57 |
| | : | | |
| BARCLAY de WET, et al., | : | | |
| | : | | |
| Defendants. | : | | |

**MEMORANDUM OPINION**

**GRANTING DEFENDANTS' MOTIONS TO DISMISS**

## I. INTRODUCTION

Plaintiffs once more bring this shareholder derivative action based on alleged mismanagement of two closely held family corporations. *See* First Am. Verified S'holder Derivative Compl. ("Am. Compl."), ECF No. 52. The Court dismissed a previous complaint for lack of subject-matter jurisdiction but permitted jurisdictional discovery to allow Plaintiffs to establish diversity. *See* Order Granting Defs.' Mot. Dismiss, ECF No. 44; Order Granting Pls.' Mot. Limited Disc., ECF No. 49. The Defendants again move to dismiss for lack of subject-matter jurisdiction, and also for lack of personal jurisdiction and for failure to state a claim. The Court finds that it has subject-matter jurisdiction to hear the case by dismissing a dispensable party. The Court also finds that it has personal jurisdiction over all Defendants. Proceeding on, the Court determines that res judicata and a prior settlement agreement preclude Plaintiffs from pressing their claims here. Thus, for the reasons stated below, the Defendants' motions to dismiss are GRANTED.

## II.  BACKGROUND

### A.  Relevant History and the Parties

This is a case about family members disputing control of two closely-held corporations, the Tierney Corporation and the Leatherwood Company (together, the "Companies").  *See* Am. Compl. ¶¶ 11–13.  The Tierney Corporation owns 62% of the Leatherwood Company, which is therefore a majority-owned subsidiary of the Tierney Corporation.  *Id.* ¶ 13.  The Companies originally engaged in land and mineral reserve ventures, but later expanded operations to include television and radio stations, medical device development, and commercial and residential real estate.  *Id.* ¶¶ 11, 22.  The facts of this case concern the Companies' real estate operations.

The relevant history begins with Colonel Laurence E. Tierney, Sr., who owned and operated the Companies in the first half of the twentieth century.  *Id.* ¶ 11.  Following Colonel Tierney's death, ownership and control of the companies passed on through his lineage.  In recent decades, the Tierney Corporation has been primarily owned by three branches of the family.  *Id.* ¶ 12.  The first relevant branch descends from the late Ann Tierney Smith.  She and her immediate family, including her children Barclay de Wet and Laurence Smith, have owned approximately 27.5% of the Tierney Corporation.[1]  *Id.*  The next is C. Matthew S. Tierney ("Matt Tierney") and his immediate family, including his son Peyton Tierney, who have owned approximately 21.1% percent.  *Id.*  Finally, the late L. Clark Tierney, Jr.  ("Clark Tierney") and his immediate family, including his late-wife Carolyn K. Tierney Griesemer ("Carol Griesemer") and his children Christopher Scott Tierney ("Chris Tierney"), Lee Mountcastle Kenna Tierney ("Kenna Tierney"), and Lewis Tierney, have owned approximately 21%.  *Id.* ¶¶ 12, 18.

---

[1] Ann Tierney Smith passed away in December 2021, after this action was initially filed, and her Estate was substituted as a Defendant in the Amended Complaint.  Am. Compl. ¶ 5 n.2.

These family branches strongly disagree about control of the Companies.  *Id.* ¶ 15.  After Clark Tierney passed away in 2000, his wife Carol Griesemer took over his seat on the Tierney Corporation Board, but not his seat on the Leatherwood Company Board or the Executive Committee.  *Id.*  Instead, Ann Tierney Smith appointed her personal attorney Douglas Woloshin, who is a District of Columbia licensed attorney and a partner at Duane Morris LLP, to fill those positions.  *Id.* ¶¶ 15, 33.  The Plaintiffs allege that this maneuver began multiple decades of self-dealing by Ann Tierney Smith and Matt Tierney and their families, and by Mr. Woloshin.  *Id.* ¶¶ 15, 23.

The composition of the Boards has continued to change over the years, and none of the individuals mentioned in the preceding paragraph remain on the Board of either of the Companies.  Ann Tierney Smith served as President of the Boards of both Companies and on the Executive Committee from 2000 until December 2017, when she was replaced by her daughter, Barclay de Wet.  *Id.* ¶ 17.  Matt Tierney retired from the Boards of both Companies and the Executive Committee in October 2016 and was replaced by his wife Patricia Tierney, who was in turn replaced by her son Peyton Tierney on January 8, 2020.  *Id.*  Meanwhile, Ms. Griesemer served on the Board of the Tierney Corporation from 2001 until she was replaced by her son Lewis Tierney in 2016, and she is now deceased.  *Id.* ¶ 18.  Mr. Woloshin stepped down in 2022 pursuant to a court-approved settlement, which will be discussed in greater detail below.[2]  As a result, the Tierney Corporation Board is currently composed of five members, including Barclay

---

[2] The complaint pleads that Mr. Woloshin was a member of the Boards of both Companies, *see* Am. Compl. ¶¶ 19–20, but he represents, and Plaintiffs accept, that he has already resigned from the Boards and the Executive Committee, *see* Pls. Opp'n Mot. Dismiss Defs. Duane Morris LLP and Douglas Woloshin ("Pls. Opp'n Woloshin") at 45, ECF No. 60.

de Wet, Peyton Tierney, Laurence Smith, and Lewis Tierney.[3]  *Id.* ¶ 19.  Barclay de Wet and

Peyton Tierney are also Executive Committee officers and possess a "significant amount of

control (if not total control) over the company."[4]  *Id.* ¶ 19.

This lawsuit was brought by Chris Tierney, Kenna Tierney, and the Estate of Carol

Griesemer (collectively, "Plaintiffs") and the defendants are Barclay de Wet, Peyton Tierney,

Laurence Smith, the Estate of Ann Tierney Smith, Douglas Woloshin, and Duane Morris LLP

(collectively, "Defendants").[5]  Because this lawsuit is a shareholder derivative action, the

Tierney Corporation and the Leatherwood Company are also nominal defendants.[6]  Barclay de

Wet, Peyton Tierney, and Laurence Smith appear to be generally aligned with each other, while

Lewis Tierney and his siblings Chris Tierney and Kenna Tierney are aligned as an opposing

faction.  *Id.* ¶¶ 23, 74–78.

### B.  The 2009 Horse Farm Transfer

In 2009, the Companies exchanged a Walgreens for a horse farm owned by Ann Tierney

Smith.  Am. Compl. ¶¶ 61, 66–67.  Before the exchange, the Companies commissioned an

appraisal of the horse farm that valued it at $5,200,000.  *Id.* ¶ 55.  However, the May 2008

---

[3] The complaint lists these four individuals, plus Mr. Woloshin, as the five directors on
the Board.  Am. Compl. ¶ 19.  It is unclear who replaced Mr. Woloshin on the Board.

[4] The complaint says that the membership of the Executive Committee was composed of
these two individuals and Mr. Woloshin.  *See* Am. Compl. ¶ 19.  Like with the Board, it is
unknown who, if anyone, replaced Mr. Woloshin on the Executive Committee.  *See id.*

[5] The Plaintiffs are all citizens of Colorado.  *See* Am. Compl. ¶¶ 24–26.  Barclay de Wet,
Peyton Tierney, and the Estate of Ann Tierney Smith are citizens of Kentucky.  *Id.* ¶¶ 29, 31–32.
Laurence Smith is a citizen of Maryland.  *Id.* ¶ 30.  Mr. Woloshin is a citizen of Florida.  *Id.* ¶
33.  Finally, Duane Morris LLP is a partnership and takes on the citizenship of its partners.  *Id.* ¶
34.  As relevant here, and discussed in greater detail below, the parties dispute whether Duane
Morris LLP is a citizen of Colorado.  *Id.*

[6] The Companies are citizens of both West Virginia and Washington, D.C.  *See* Am.
Compl. ¶¶ 27–28.

appraisal was subject to an assumption that the horse farm would receive a $20,648,750 infrastructure investment that never occurred, as well as an assumption that the property would be re-zoned.  *Id.* ¶ 57–59.  Plaintiffs allege Mr. Woloshin misrepresented the appraisal by failing to inform the Leatherwood Board of the assumptions behind the valuation.  *Id.* ¶ 60.  Ann Tierney Smith was also allegedly aware that the appraisal was inaccurate but colluded with Mr. Woloshin to misinform the Leatherwood Board.  *Id.* ¶ 65.  The Leatherwood Board approved the transaction on October 7, 2009.[7]  *Id.* ¶ 66.

On October 9, 2009, the Companies held their annual directors meeting, where Ms. Griesemer questioned Mr. Woloshin in front of the Board about the valuation of the horse farm.  Am. Compl. ¶ 67.  Mr. Woloshin allegedly misrepresented the valuation and falsely equated the value of the horse farm to the Walgreens.  *Id.* ¶ 68.  Ms. Griesemer requested to see the appraisal and all documentation that the decision was based on, and Mr. Woloshin noted the request.  *Id.* ¶ 69.  Mr. Woloshin, Ann Tierney Smith, and Matt Tierney never gave Ms. Griesemer a copy of the appraisal.  *Id.*  Her son Lewis Tierney continued to request a copy when he joined the Board in October 2016 and at times thereafter, but Ann Tierney Smith, Ms. de Wet, Mr. Woloshin, and other Board members would not provide it.  *Id.* ¶ 71.

---

[7] Plaintiffs allege that the transaction caused the Company to lose $3.8 million—the companies paid $600,000 for the option to acquire the horse farm and gave away a Walgreens worth $4.6 million, for a total of $5.2 million, while the horse farm was worth only $1.4 million. Am. Compl. ¶¶ 61, 66.  Plaintiffs say that they "enlisted the services of an independent appraiser who opined that absent the $20.65 million infrastructure investment, the horse farm property was worth $1,454,483."  *Id.* ¶ 57.

### C.  Prior Litigation

#### 1.  The First Lawsuit

On March 10, 2017, Lewis Tierney, Chris Tierney, Ms. Griesemer, and two trusts f/b/o Carol Griesemer filed a shareholder derivative action on behalf of the Companies in the Circuit Court of Kanawha County, West Virginia (the "First Lawsuit").  *See Tierney v. Tierney*, No. 17-C-346 (Cir. Ct. Kanawha Cnty.).  In six counts, the Plaintiffs alleged a series of wrongful acts by Defendants Ann Tierney Smith and Mr. Woloshin, seeking to have them removed as Directors of the Companies.  *See generally* Compl. in *Tierney v. Tierney*, No. 17-C-346, Ex. 3 to Mem. P. & A. Supp. Defs. Duane Morris LLP's & Douglas Woloshin's Mot. Dismiss ("Mem. P. & A. Woloshin") at 22–29, ECF No. 9-5.[8]  Plaintiffs also alleged breach of fiduciary duty, gross negligence, mismanagement, self-dealing, and corporate waste against the director Defendants.  *See id.*  In other charges, Plaintiffs targeted Mr. Woloshin and Duane Morris LLP, alleging a breach of fiduciary duty and several alternative claims for excessive legal fees.  *See id.*  The case was transferred to the Business Court Division, which dismissed the case for failure to comply with the demand requirements of West Virginia Rule of Civil Procedure 23.1.[9]  *See* Business Court Order, December 7, 2017, Ex. 4 to Mem. P. & A. Woloshin, ECF No. 9-6.

#### 2.  The Second Lawsuit

On January 26, 2018, the plaintiffs who filed the first lawsuit made a demand on the Companies' board of directors and the shareholders.  *See* Am. Compl. ¶ 42.  Shortly afterward

---

[8] The Court takes judicial notice of court documents from the West Virginia litigation, some of which have been filed to this action's docket as exhibits to a previous motion to dismiss. *See, e.g.* Mem. P. & A. Woloshin.  That motion concerned a prior version of the complaint, and this opinion cites to those exhibits purely for ease of reference.

[9] West Virginia law requires derivative plaintiffs to make a demand on the board of directors and the shareholders.  *See* Business Court Order, December 7, 2017 (citing *Rathbone v. Parkersburg Gas Co.*, 8 S.E. 570, 572–74 (W. Va. 1888)).

the plaintiffs filed a second lawsuit, again in the Circuit Court of Kanawha County, West

Virginia, which had allegations that were largely duplicative of the first lawsuit.  *See Tierney v.*

*Tierney,* No. 18-C-90 (Cir. Ct. Kanawha Cnty.) (the "Second Lawsuit"); *see also* Compl. in

*Tierney v. Tierney*, No. 18-C-90 ("Second Lawsuit Compl."), Ex. 5 to Mem. P. & A. Woloshin,

ECF No. 9-7.

In response to the demand and renewed litigation, Ms. de Wet hired a third-party law

firm, Dinsmore & Shohl LLP ("Dinsmore"), to investigate the allegations.  Am. Compl. ¶ 43.

Two years later, on May 19, 2020, Dinsmore completed a 72-page report (the "Dinsmore

Report").  *Id.* ¶ 44.  The Dinsmore Report stated that "reasonable minds could conclude that Ann

Tierney Smith improperly benefitted from the horse-farm transaction at the expense of

Leatherwood[.]"  *Id*. ¶ 45.  The Dinsmore Report noted that the 2006 valuation of the horse farm

at $5,200,000 relied on an assumption about a $20,600,000 infrastructure investment that "was

no longer accurate" when the horse-farm exchange was approved.  *Id.*  Nonetheless, Dinsmore

recommended that the Companies should not pursue the claims because they would not survive

the statute of limitations or the safe harbor rule.  *Id.*  Through Dinsmore's investigation,

Plaintiffs received a copy of the horse-farm appraisal.  *Id.* ¶ 52.

The day after the Dinsmore Report was released, the Executive Committee sent a letter to

the Companies' shareholders asking them to vote to dismiss the claims.  Am. Compl. ¶ 46.  The

letter did not include the Dinsmore Report itself, instead offering a summary:

> Dinsmore's report concludes that the plaintiff's allegations are flawed and recommends
> that the stockholders reject the plaintiff's demand and the companies move to dismiss the
> lawsuit. The investigation uncovered no fraud, concealment, or other intentional
> wrongdoing. Dinsmore observes that even if some claims could technically be pursued,
> any potential recovery is far outweighed by the risks and expenses associated with
> litigation, would distract from the companies' core business operations, and would destroy
> the companies' longstanding and valuable relationship with Duane Morris. I agree with our

independent counsel's conclusion that pursuing this lawsuit is not in the companies' best interests and agree that the companies should therefore ask the Court to dismiss the case. *Id.* Plaintiffs allege sending this letter was a violation of the Companies' bylaws, which say that the Board may delegate certain powers to the Executive Committee "except . . . to recommend to stockholders any action requiring stockholders' approval." *Id.* ¶ 47.

That same day, the Executive Committee also sent a letter to the shareholders calling for a May 30, 2020, shareholder vote on dismissing the claims. *Id.* ¶ 49. That letter attached a proxy, but not the Dinsmore Report. *Id.* ¶ 50. At the vote, the shareholders voted not to pursue Plaintiffs' claims. *Id.* Immediately after, on May 31, 2020, the Board voted to seek dismissal of Plaintiffs' claims. *Id.* ¶ 51. The Companies then moved to dismiss the Second Lawsuit. *See* Mot. Dismiss Tierney Corp. & Leatherwood Corp., Ex. 6 to Mem. P. & A. Woloshin, ECF No. 9-8.

### 3. The Settlement Agreement

The settlement agreement for the Second Lawsuit (the "Settlement Agreement") is highly relevant to this action. After the Companies moved to dismiss, but before the West Virginia court resolved the motion, Plaintiffs "raised the specter of a third lawsuit—on substantively similar but procedurally different grounds." Order Granting Prelim. Settlement Approval on November 4, 2021 ("Prelim. Settlement Approval"), ¶ 9, ECF No. 38-1. The Companies and the defendants to the Second Lawsuit engaged in settlement discussions to receive "additional finality which may not be otherwise afforded by dismissal." *Id.* Plaintiffs allege that these discussions did not include them, the Board, or the shareholders. Am. Compl. ¶ 80.

However, the West Virginia court reviewed the proposed Settlement Agreement and included Plaintiffs and shareholders in this process. The Business Court Division received briefing from the parties, including opposition from current Plaintiffs, and preliminarily

approved the settlement on November 4, 2021. *See* Prelim. Settlement Approval. The court made several findings and conclusions, including that Plaintiffs' claims had little prospect of success. *Id.* ¶¶ 19–20. The court scheduled a final approval hearing and implemented a notice and objection process for shareholders. *Id.* at 8–9. Lewis Tierney—a plaintiff in the First and Second Lawsuits, but not here—asked shareholders to object to the settlement. *See* Order Granting Final Settlement Approval on February 16, 2022 ("Final Settlement Approval"), Ex. 1 to Defs. Duane Morris LLP & Douglas Woloshin Mot. File Suppl. Br., ECF No. 42-2; Lewis Tierney Letter to Tierney Corp. S'holder on May 27, 2020, Ex. 1 to Woloshin Mot. at 1–5, ECF No. 57-2. Plaintiffs here also objected to the proposed settlement. Final Settlement Approval.

On January 11, 2022, the West Virginia Business Court held the final settlement approval hearing. *See* Final Settlement Approval. The court noted that "[o]ther than the plaintiffs, no other shareholders objected to the Settlement or otherwise participated at the final fairness hearing." *Id.* ¶ 19. The court acknowledged the current action, which was filed on June 28, 2021, recognizing that it "did not have the authority to dismiss the federal action," which could only be dismissed "in accordance with all proper procedures and relevant law in the jurisdiction." *Id.* ¶ 9. Finally, the court determined that the settling parties satisfied West Virginia Rule 23.1 and the proposed settlement was fair, reasonable, and adequate.[10] *Id.* ¶¶ 20–34. The Court granted the Companies' motion to the approve the settlement and dismissed all claims with prejudice. *Id.* at 10. Consequently, the Companies and defendants in the Second Lawsuit entered into the Settlement Agreement and Release of Claims ("Settlement Agreement"), ECF No. 43-1.

---

[10] West Virginia Rule 23.1, in parallel to Federal Rule of Civil Procedure Rule 23.1, governs derivative actions.

The Settlement Agreement released Defendants from "any and all manner of liability [and] claims . . . in any way growing out of, resulting from, or relating to the claims which were or could have been asserted in the Civil Actions."  Settlement Agreement at 5.  The defined term "Civil Actions" explicitly included the First Lawsuit, Second Lawsuit, and the current case.  *Id.* at 3.  In addition to releasing the claims against the named Defendants to the Second Lawsuit, the Settlement Agreement also released all existing claims by the Company against any of its directors.  *Id.* at 5 (stating that the release applies to "all of the Companies' current and former officers and directors").  As part of the Settlement Agreement, Duane Morris LLP and Mr. Woloshin dropped their indemnification claims against the Companies (more than $500,000), forgave legal fees (over $167,000), and made a settlement payment ($123,000).  *Id.* at 5–8; Final Settlement Approval at 3.  Mr. Woloshin also resigned from the Board and Executive Committee.  Settlement Agreement at 7.

On March 16, 2022, the plaintiffs filed a notice of appeal with the West Virginia Supreme Court of Appeals, arguing that the West Virginia Business Court improperly approved the settlement.  *See* Notice of Appeal, Ex. 4 to Woloshin Mot., ECF No. 57-5.  Yet, on June 9, 2022, the plaintiffs voluntarily dismissed the appeal with prejudice.  Am. Unopposed Mot. Voluntary Dismissal, Ex. 5 to Woloshin Mot., ECF No. 57-6.  On August 1, 2022, the Supreme Court of Appeals granted dismissal.  Order Dismissing Appeal, Ex. 6 to Woloshin Mot., ECF No. 57-7.

### 4. The Third and Current Lawsuit

Plaintiffs filed a complaint in this action in 2021.[11]  The Court dismissed the complaint for lack of subject-matter jurisdiction but permitted jurisdictional discovery to give Plaintiffs an opportunity to fix the defects. *Tierney v. de Wet*, No. CV 21-1714 (RC), 2022 WL 951380, at *5 (D.D.C. Mar. 30, 2022).  The Plaintiffs filed their amended complaint on October 21, 2022.  *See* Am. Compl.  Once again, Plaintiffs assert that the Court has subject-matter jurisdiction premised on diversity of citizenship. *Id.* ¶ 9.

Like the prior lawsuits, Plaintiffs focus on the horse-farm transaction. They bring claims for Fraudulent Misrepresentation (Count I), Negligent Misrepresentation (Count II), Breach of Contract (III), and Breach of Implied Covenant of Good Faith and Fair Dealing (Count IV) against Mr. Woloshin and Duane Morris LLP. *Id.* ¶¶ 85–107.  The core of these allegations is that Mr. Woloshin and Duane Morris LLP made misrepresentations to the Companies' board members regarding the appraisal of the horse farm.  They also bring claims against the Estate of Ann Tierney Smith for Aiding and Abetting Fraud (Count V), and a Civil Conspiracy claim (Count VI) against the Estate, Mr. Woloshin, and Duane Morris LLP. *Id.* ¶¶ 108–19.

Two of the counts do diverge from the horse-farm transaction itself and into the events surrounding previous litigation.  Plaintiffs allege that Mr. Woloshin, Ms. de Wet, Laurence Smith, and Peyton Tierney improperly withheld material information from shareholders while shareholders were deciding whether to pursue the Second Lawsuit, constituting a Breach of the Duty to Disclose (Count VII). *Id.* ¶¶ 120–24.  Finally, Plaintiffs seek Removal of Directors

---

[11] As described above, this litigation began after the Second Lawsuit was filed but before the Settlement Agreement.

(Count VIII), and argue that removing Ms. de Wet, Laurence Smith, and Peyton Tierney as directors would be in the best interest of the Companies.[12]  *Id.* ¶¶ 125–28.

The Defendants have filed four separate motions to dismiss, by (1) the Estate of the Ann Tierney Smith ("Tierney Smith Mot."), ECF No. 54-1; (2) Peyton Tierney ("Peyton Tierney Mot."), ECF No. 55-1; (3) Barclay de Wet and Mr. Laurence Smith ("de Wet Mot."), ECF No. 56-1; and (4) Douglas Woloshin and Duane Morris LLP ("Woloshin Mot."), ECF No. 57-1. Although filed independently and each containing specific arguments for why particular defendant(s) should be dismissed, these motions reference and incorporate arguments made within each other.  At a high level, Defendants move to dismiss based on lack of subject-matter jurisdiction, lack of personal jurisdiction, res judicata, issue preclusion, failure to allege fraud with specificity, statute of limitations, and on a host of other arguments that Plaintiffs have failed to state a claim.  The Court now considers these motions.

### III.  LEGAL STANDARD

#### A.  Federal Rule of Civil Procedure 12(b)(1)

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff has the burden of proving that the Court has subject-matter jurisdiction to hear the claims.  Fed. R. Civ. P. 12(b)(1); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992).  A court has an "affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority."  *Grand Lodge of the Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001).  For this reason, "the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  *Id.* at 13–14

---

[12] Plaintiffs originally included Mr. Woloshin in Count VIII, but as he is no longer a director, now "withdraw Count VIII with respect to Woloshin."  Pls. Opp'n Woloshin at 45.

(citations and internal quotation marks omitted).  When resolving a Rule 12(b)(1) motion, the Court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005) (citations omitted).  When "[f]aced with motions to dismiss under Rule 12(b)(1) and Rule 12(b)(6), a court should first consider the Rule 12(b)(1) motion because once a court determines that it lacks subject-matter jurisdiction, it can proceed no further." *Ctr. for Biological Diversity v. Jackson*, 815 F. Supp. 2d 85, 90 (D.D.C. 2011) (citations and internal quotation marks omitted).

### B.  Federal Rule of Civil Procedure 12(b)(2)

On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the "burden of establishing a factual basis for the exercise of personal jurisdiction over [each] defendant." *Crane v. N.Y. Zoological Soc'y*, 894 F.2d 454, 456 (D.C. Cir. 1990); Fed. R. Civ. P. 12(b)(2); *see also Livnat v. Palestinian Auth.*, 851 F.3d 45, 56–57 (D.C. Cir. 2017) (noting that plaintiffs must "make a prima facie showing of the pertinent jurisdictional facts").  The Court resolves factual disputes in plaintiffs' favor "[w]hen deciding personal jurisdiction without an evidentiary hearing," but the Court "need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts." *Livnat*, 851 F.3d at 57 (citations and internal quotation marks omitted).  Plaintiffs must establish that the Court has personal jurisdiction either through general jurisdiction or specific jurisdiction. *Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883, 888–89 (D.C. Cir. 2021).  General jurisdiction "permits a court to assert jurisdiction over a defendant based on a forum connection unrelated to the underlying suit." *Id*. at 889 (internal quotation marks and brackets omitted).  Specific jurisdiction is narrower and "depends on an affiliation between the forum and the underlying controversy, principally, activity or an

occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id*. at 888 (internal quotation marks and brackets omitted).  The Court's exercise of specific jurisdiction must satisfy the Due Process Clause of the U.S. Constitution and the District of Columbia's long-arm statute.  *GTE New Media Servs. Inc. v. BellSouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000).  Accordingly, "a plaintiff must show 'minimum contacts' between the defendant and the forum establishing that 'the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'"  *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

### C.  Federal Rule of Civil Procedure 12(b)(6)

A Rule 12(b)(6) motion tests whether a plaintiff has stated a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  When considering such a motion, the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (citations and internal quotation marks omitted).  Although "detailed factual allegations" are not required to withstand a Rule 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)).  A claim is plausible if "it contains factual allegations that, if proved, would allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (citations and internal quotation marks omitted).  The Court need not accept as true "a legal conclusion couched as a factual allegation," nor an inference unsupported by the facts set forth in the complaint.  *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (citations omitted).

14

Res judicata serves "to conserve judicial resources, avoid inconsistent results, engender respect for judgments of predictable and certain effect, and to prevent . . . piecemeal litigation." *Hardison v. Alexander*, 655 F.2d 1281, 1288 (D.C. Cir. 1981); *see also Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) ("The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as res judicata."). Res judicata is an affirmative defense, but it "may be raised by pre-answer motion under Rule 12(b) when the facts that give rise to the defense are clear from the face of the complaint." *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998). In addition, res judicata is "properly brought in a pre-answer Rule 12(b)(6) motion when all relevant facts are shown by the court's own records . . . ." *Ponder v. Chase Home Fin., LLC*, 865 F. Supp. 2d 13, 16 n.2 (D.D.C. 2012) (quoting *Camp v. Kollen*, 567 F. Supp. 2d 170, 172 n.3 (D.D.C. 2008). Res judicata is also properly brought when the relevant facts are shown by records "from other proceedings." *Hemphill v. Kimberly–Clark Corp.*, 530 F. Supp. 2d 108, 111 (D.D.C. 2008).

Finally, and similarly, release of claims is another affirmative defense that may be adjudicated by a Rule 12(b)(6) motion "when the facts giving rise to the defense are apparent on the face of the complaint." *Gardner v. Erie Ins. Co.*, 639 F. Supp. 3d 135, 141 (D.D.C. 2022) (citations omitted). The Court "may consider 'the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the plaintiff in the complaint but by the defendant in a motion to dismiss." *Id*. at 140 (quoting *Hinton v. Corrs. Corp. of America*, 624 F. Supp. 2d 45, 46 (D.D.C. 2009)).

## IV.  ANALYSIS

To cut through the voluminous briefing on this motion, the Court offers a roadmap for its analysis.  First, the Court considers the motion to dismiss for lack of subject-matter jurisdiction. After finding that Duane Morris LLP's presence as a defendant destroys diversity and jurisdiction in this case, the Court uses its discretion to drop Duane Morris LLP as a non-essential party.  The Court then evaluates Peyton Tierney, Ms. de Wet, and Laurence Smith's personal jurisdiction arguments and holds that it can exercise personal jurisdiction over these defendants.  Next, the Court considers whether res judicata applies here, and determines that res judicata precludes Counts I through VI of the Complaint.  The Court moves onto assessing the Settlement Agreement and finds that the Settlement Agreement released the remaining counts, Count VII and Count VIII, and that Plaintiffs are precluded from relitigating the validity of the Settlement Agreement.  Because the Court views every count as either precluded or released, it does not decide the remaining arguments for dismissal.

### A.  Although Duane Morris LLP Defeats Subject-Matter Jurisdiction, the Court Drops Duane Morris LLP as a Party to Preserve Jurisdiction Over this Action.

Diversity exists between most of the Plaintiffs and Defendants.  Plaintiffs are all citizens of Colorado.  Am. Compl. ¶¶ 24–26.  The Companies are citizens of West Virginia and Washington, D.C.  *Id.* ¶¶ 27–28.  And Defendants Ms. de Wet, Peyton Tierney, and the Estate of Ann Tierney Smith are all citizens of Kentucky, while Defendant Laurence Smith is a citizen of Maryland and Defendant Mr. Woloshin is a citizen of Florida.  *Id.* ¶¶ 29–33.  However, Defendant Duane Morris LLP argues that it has one partner, Ms. Mariette J. Stigter, who was

domiciled in Colorado at the time the action was filed.[13]  Woloshin Mot. at 16.  Plaintiffs dispute Ms. Stigter's citizenship, and alternatively ask the Court to drop Duane Morris LLP as a party if it determines that Ms. Stigter and Duane Morris LLP are citizens of Colorado.  *See* Pls. Opp'n Woloshin at 2–4.

The parties agree that a "person's domicile, for jurisdictional purposes, is determined by (1) their physical presence in a state, and (2) their intent to remain there indefinitely. [C]ourts apply a presumption of continuing domicile, so that domicile in one place remains until domicile in a new place is established.'" *E.M. v. Shady Grove Reprod. Sci. Ctr. P.C.*, 496 F. Supp. 3d 338, 368 (D.D.C. 2020) (internal citations and quotations omitted); *see* Pls. Opp'n Woloshin at 3. Duane Morris LLP introduces evidence that at the time the Complaint was filed in 2021, Ms. Stigter was domiciled in Colorado.  *See* Mariette J. Stigter Decl. ("Stigter Decl."), Ex. 1 to Reply Supp. Defs. Duane Morris LLP's & Douglas Woloshin's Mot. Dismiss ("Woloshin Reply"), ECF No. 67-1.  Ms. Stigter maintained her primary residence in Colorado, was a Colorado resident for tax purposes, personally considered Colorado to be her residence, and was physically present in Colorado for more than half of the year. *Id.* ¶¶ 3–7.  Ms. Stigter is a legal permanent resident of the United States and a Dutch citizen. *Id.* ¶ 2.

Plaintiffs dispute that Ms. Stigter was domiciled in Colorado, but this argument is unpersuasive.  They claim that Ms. Stigter did not spend the majority of 2021 in Colorado, apparently based solely on Duane Morris's interrogatory response that Ms. Stigter spent the first five months of the year in Colorado uninterrupted, and then was present for portions of October and November.  Pls. Opp'n Woloshin at 2.  Ms. Stigter's declaration states that her time in

---

[13] Duane Morris LLP, as a limited liability partnership, is a citizen of each state where a partner is a citizen. *Johnson-Brown v. 2200 M St. LLC*, 257 F. Supp. 2d 175, 178 (D.D.C. 2003).

Colorado added up to more than half of 2021 and the Court sees no evidence contradicting this point.  Stigter Decl. ¶ 7.  Plaintiffs also argue that Ms. Stigter was not domiciled in Colorado because she was not a barred attorney in Colorado.  Pls. Opp'n Woloshin at 3.  While Plaintiffs cite a case that found it "highly significant" that an attorney did not apply for admission in his purported domicile, this situation is factually distinct from that case.  *See id.* (citing *Spanos v. Skouras Theatres Corp.*, 235 F. Supp. 1, 4 (S.D.N.Y. 1964), *rev'd in part on other grounds*, 364 F.2d 161 (2d Cir. 1966)).  Ms. Stigter is not a litigator, and while she officially practices out of Duane Morris's San Francisco, California, office, she has not visited that office since February 2020.  Stigter Decl., ¶¶ 15–17.  Remote work, even from another state, is now common, and that is especially true following the start of the COVID-19 pandemic.  The Court finds that regardless of Ms. Stigter's remote work arrangement, she was domiciled in Colorado in 2021.

Plaintiffs also argue that diversity exists under 28 U.S.C. § 1332(a)(3), which allows for subject-matter jurisdiction over suits between "citizens of different States and in which citizens or subjects of a foreign state are additional parties."  Pls. Opp'n Woloshin at 3.  This argument fails.  As Duane Morris LLP notes, partnerships are a "single artificial entity" for the purposes of the diversity statute.  *Carden v. Arkoma Assocs.*, 494 U.S. 185, 187 n.1 (1990); *see* Woloshin Mot. at 16.  While Ms. Stigter's domicile is relevant for determining Duane Morris's citizenship, her status as a permanent resident is irrelevant for invoking § 1332(a)(3) in this case.  Further, the current language and structure of § 1332(a) stems from a 2011 statutory change *restricting* the scope of jurisdiction and clarifying that diversity does not exist between an alien permanent resident and a nonresident alien.  *See H.K. Huilin Int'l Trade Co. v. Kevin Multiline Polymer Inc.*, 907 F. Supp. 2d 284, 285–89 (E.D.N.Y 2012) (detailing pertinent changes to diversity

statute); *NY Metro. Reg'l Ctr. v. Mammoet USA Holding, Inc.*, 552 F. Supp. 3d 451, 459–60 (S.D.N.Y. 2021) (same).  Section 1332(a)(3) does not provide for jurisdiction here.

Because the Court finds that Duane Morris LLP destroys diversity in this case, it turns to Plaintiff's alternative request to drop Duane Morris LLP as a non-essential party.  *See* Pls. Opp'n Woloshin at 4–5.  Plaintiffs note that "the court may at any time, on just terms, add or drop a party." *Id.* at 4 (citing Fed. R. Civ. Pro. 21).  A district court may "dismiss so-called 'jurisdictional spoilers'—parties whose presence in the litigation destroys jurisdiction—if those parties are not indispensable and if there would be no prejudice to the parties." *In re Lorazepam & Clorazepate Antitrust Litig.*, 631 F.3d 537, 542 (D.C. Cir. 2011).  Plaintiffs argue that Duane Morris LLP is a dispensable party, citing Duane Morris LLP and Mr. Woloshin's admission that the "claims against Duane Morris LLP are predicated entirely upon the conduct of Mr. Woloshin." *See* Pls. Opp'n Woloshin at 5 n.4 (quoting Woloshin Mot. at 43 n.31).  None of the Defendants make an argument that Duane Morris LLP is in fact an indispensable party; Duane Morris LLP and Mr. Woloshin say only that the Court should dismiss this action entirely based on Plaintiffs "squander[ing] the opportunity to cure the jurisdictional defects contained in their pleading."  Woloshin Reply at 5, ECF No. 67.

In a previous opinion in this action, the Court specifically noted its inclination to drop a non-essential party to resolve the subject-matter jurisdiction in this case, although it did not do so because there were multiple defects in diversity.  *See Tierney*, 2022 WL 951380, at *4 ("Were this the only defect in diversity, the Court might have exercised its discretion under Federal Rule of Civil Procedure 21 to drop diversity-destroying parties, as urged by Plaintiffs.").  Here, there is only one defect.  The Court does not see any prejudice that would occur from dropping Duane Morris LLP, and Plaintiffs' claims against Duane Morris LLP stem completely from Mr.

Woloshin's actions.  And although the Court is displeased that Plaintiffs still have not resolved their jurisdictional defects despite being given a second opportunity, it would be overly rigid to dismiss this action based on one dispensable Defendant having one partner who destroys diversity.  Accordingly, the Court exercises its discretion to drop Duane Morris LLP as a party to preserve diversity and subject-matter jurisdiction over this case, and the motion to dismiss for lack of subject-matter jurisdiction is denied.  *See, e.g.*, *Doe v. Exxon Mobil Corp.*, 69 F. Supp. 3d 75, 101 (D.D.C. 2014) (dismissing unnecessary party to preserve complete diversity).

## B.  The Court Has Personal Jurisdiction Over All Defendants.

Peyton Tierney, Ms. de Wet, and Laurence Smith all argue that the Court lacks personal jurisdiction over them.  *See* Peyton Tierney Mot. at 13–14; de Wet Mot. at 3.  The Court disagrees and concludes that it may exercise personal jurisdiction over these three non-resident Defendants.

If the Court has personal jurisdiction here, it would be specific jurisdiction.[14]  For specific jurisdiction, the relationship between the defendant, the forum, and the litigation "is the essential foundation of [personal] jurisdiction."  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984) (citation omitted).  The District of Columbia's long-arm statute law is expansive, and coextensive with the Due Process Clause with respect to defendants transacting business in the District of Columbia.  *See Helmer v. Doletskaya*, 393 F.3d 201, 205 (D.C. Cir. 2004); *see also* D.C. Code § 13–423 (2023).  To determine whether specific jurisdiction over a defendant exists, the Court looks to whether "there [is] some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum

---

[14] Peyton Tierney, Ms. de Wet, and Laurence Smith are all non-residents of the District of Columbia, and Plaintiffs do not argue the Court has general jurisdiction over any of these defendants.  Am. Compl. ¶¶ 29–31.

State, thus invoking the benefits and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).  In the District of Columbia "under certain circumstances, individual defendants can fairly be haled into court based on actions they took on behalf of their business organization." *Bronner v. Duggan*, 249 F. Supp. 3d 27, 39 (D.D.C. 2017) (citation omitted).  But there "is no 'mechanical test' for determining whether a court has personal jurisdiction over an individual defendant who acted on behalf of an organization; courts 'weigh the facts of each case.'"  *Id.* (quoting *Family Fed'n for World Peace v. Hyun Jin Moon*, 129 A.3d 234, 243 (D.C. 2015)).

Of course, the above is another way of saying that the Court does not have jurisdiction over these defendants merely because it has jurisdiction over the Companies: "as a general rule, courts cannot exert jurisdiction over individual corporate officers or employees 'just because the court has jurisdiction over the corporation.'"  *Kopff v. Battaglia*, 425 F. Supp. 2d 76, 84 (D.D.C. 2006) (quoting *Flocco v. State Farm Mut. Auto. Ins. Co.*, 752 A.2d 147, 162 (D.C. 2000)).  But Peyton Tierney's references to the "fiduciary-shield" or "corporate shield" doctrine are outdated.  S*ee* Def. Peyton Tierney Reply Supp. Mot. Dismiss ("Peyton Tierney Reply") at 10, ECF No. 66 ("Personal jurisdiction over officers or directors of a corporation in their individual capacities 'must be based on their personal contacts with the forum, not their acts and contacts carried out solely in a corporate capacity.'" (quoting *Overseas Partners, Inc. v. Progen Musavirlik Ve Yonetim Hizmetleri, Ltd.*, 15 F. Supp. 2d 47, 51 (D.D.C. 1998))).  More recently, the D.C. Circuit has held that "when evaluating under the Due Process Clause an individual's contacts with the forum state, courts cannot ignore contacts made by the individual just because they were made in his or her capacity as an employee or corporate officer." *Urquhart-Bradley v. Mobley*, 964 F.3d 36, 46 (D.C. Cir. 2020).  The D.C. Circuit further held that "the relevant prong of the District of

Columbia's long arm statute reaches as far as the Constitution allows.  It has no room for the fiduciary shield doctrine, which would shorten the District of Columbia's jurisdictional hand." *Id*. at 47.

The Companies are registered in and have their primary place of business in the District of Columbia.  *See* Am. Compl. ¶¶ 27–28.  All Board, Executive Committee, and shareholder meetings are held in the District of Columbia.  *Id.* ¶ 49 n.7.  Plaintiffs allege that "Defendants either attended [those meetings] in person or dialed-in via phone or video link."[15]  *Id.*  In addition, three of the key documents giving rise to alleged liability under Counts VII and VIII— the May 20, 2020, letter to shareholders, a proxy attached to the letter, and the Settlement Agreement—were allegedly drafted in the District of Columbia by Mr. Woloshin acting as agent to the Board.  *Id.* ¶¶ 49–50, 80; *see also* D.C. Code § 13–423 (2023) (providing for exercise of personal jurisdiction when a person acts by an agent).

Courts regularly find personal jurisdiction over nonresident directors in similar circumstances.  In *Family Federation for World Peace*, 129 A.3d at 243, the D.C. Court of Appeals sustained personal jurisdiction over nonresident directors who allegedly improperly enriched themselves pursuant to wrongful activities committed in the District of Columbia.  As a result, the Court of Appeals "ha[d] little difficulty in concluding [that the] directors clearly could anticipate being hauled into [a District of Columbia] court to account for their activities."  *Id.* at

---

[15] The Amended Complaint does not say which Defendants attended in person, by phone, or by video link.  *See* Am. Compl. ¶ 49 n.7.  However, the Court does not believe the method of attendance would change its view.  The D.C. Circuit has implied that a single phone call could be sufficient for specific personal jurisdiction if a "defendant takes 'intentional, and allegedly tortious, actions' 'expressly aimed' at a jurisdiction."  *Urquhart-Bradley*, 964 F.3d at 48 (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)) (analyzing personal jurisdiction, but remanding to district court to decide under proper framework).  Attending several hybrid meetings hosted in the District of Columbia as a Board member surely qualifies as "personally reach[ing]" into the District.  *Id.*

243–44.  Similarly, the D.C. Court of Appeals also found personal jurisdiction over nonresident directors of a sorority who allegedly committed misconduct at a biannual meeting held in the District of Columbia.  *Daley v. Alpha Kappa Alpha Sorority, Inc.*, 26 A.3d 723, 728 (D.C. 2011).  Finally, *Bronner*, 249 F. Supp. 3d at 40, found personal jurisdiction over nonresident directors who voluntarily joined the board of a D.C. corporation and allegedly engaged in injurious action at a meeting held in the District of Columbia.

The Court concludes that this case is analogous to these preceding examples.  Peyton Tierney, Ms. de Wet, and Laurence Smith joined the Board of the Tierney Corporation, based in the District of Columbia, and attended meetings hosted in District of Columbia.  Am. Compl. ¶¶ 27–31, 49 n.7.  In their roles on the Board and at those meetings, these Defendants engaged in conduct that allegedly leads to liability in this action.[16]  And Mr. Woloshin, acting as their agent, also took several allegedly wrongful actions within the District of Columbia.  *Id*. ¶¶ 49–50, 80.  As a result, "[i]n these circumstances, the participants could reasonably anticipate being required to defend their actions in the courts of the District without offending traditional notions of fair play and substantial justice."  *Daley*, 26 A.3d at 728.  The Court will not dismiss any defendant for lack of personal jurisdiction.

### C.  Res Judicata Bars the Counts Stemming from the Horse Farm Transaction.

Having resolved the jurisdictional issues, the Court addresses the Defendants' argument that res judicata, also known as claim preclusion, bars Plaintiffs' claims.  *See* Tierney Smith Mot. at 3–5; Peyton Tierney Mot. at 6–9; de Wet Mot. at 4–8; Woloshin Mot. at 17–23.  Under the doctrine of claim preclusion, a "final judgment on the merits of an action precludes the parties or

---

[16] Additionally, Ms. de Wet and Peyton Tierney also serve as Officers on the Executive Committee, further strengthening their connection to the District.  Am. Compl. ¶19.

their privies from relitigating issues that were or could have been raised in that action." *Allen v. McCurry*, 449 U.S. 90, 94 (1980).  In this action, the Court must follow West Virginia's res judicata principles because the Second Lawsuit was adjudicated in West Virginia.  Final Settlement Approval; *see* 28 U.S.C. § 1738; *Kremer v. Chem. Constr. Corp.*, 456 U.S. 461, 466 (1982) ("Section 1738 requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the State from which the judgments emerged."); *see also Reiter v. Universal Marion Corp.,* 299 F.2d 449, 452 (D.C. Cir. 1962) (applying res judicata to dismissal of stockholder derivative action, and using New York res judicata law because the earlier final judgment was in New York).

The parties agree on the relevant three-part test for res judicata: there must be (1) "a final adjudication on the merits in the prior action"; (2) involving "either the same parties or persons in privity with those same parties"; and (3) the causes of action raised in the subsequent proceeding "must be identical to the cause of action determined in the prior action or must be such that it could have been resolved, had it been present, in the prior action." *Blake v. Charleston Area Med. Ctr., Inc.*, 498 S.E.2d 41, 49 (W. Va. 1997); *see also Bison Ints., LLC v. Antero Res. Corp.*, 854 S.E.2d 211, 218 (W. Va. 2020).  Plaintiffs do not dispute that the Second Lawsuit had a final adjudication on the merits, so the Court looks to the second and third elements to determine if res judicata applies.[17]

---

[17] As noted in the procedural history, the West Virginia trial court approved the Settlement Agreement and entered a judgment of dismissal.  *See* Final Settlement Approval. Plaintiffs appealed but then moved to dismiss the appeal with prejudice.  Am. Unopposed Mot. Voluntary Dismissal; *see State ex rel. Veard v. Miller*, 795 S.E.2d 55, 63 (W. Va. 2016) (holding that res judicata bars a subsequent action "when [the prior action] becomes final, either through failure to appeal that judgment or after exhausting appellate proceedings").

1.  The Second Element is Also Met

"[T]he key consideration for [satisfying the second element] is the sharing of the same legal right by parties allegedly in privity, so as to ensure that the interests of the party against whom preclusion is asserted have been adequately represented." *W. Va. Hum. Rts. Comm'n v. Esquire Grp., Inc.*, 618 S.E.2d 463, 469 (W. Va. 2005). This requirement is plainly met for the Plaintiffs. Two of the Plaintiffs here—Chris Tierney and Ms. Griesemer (now her Estate)—were also plaintiffs in the Second Lawsuit. *See* Second Lawsuit Compl. The third Plaintiff, Kenna Tierney, was also closely involved in that litigation. *See id.* At the time of the litigation, Kenna Tierney's shares were held in a trust that was a named party to the lawsuit, and he submitted a sworn statement in the court-approved settlement process. *See* Pls.' Objs. Proposed Settlement, Ex. 3 to Woloshin Mot. at 8, ECF No. 57-4. The Court sees the Plaintiffs between the actions as the same or in privity.[18]

The Defendants also meet the second element. Mr. Woloshin and Ann Tierney Smith (now her Estate) were defendants in the Second Lawsuit and in this one.[19] But Peyton Tierney, Ms. de Wet, and Laurence Smith were not defendants, nor were they directors when the Second Lawsuit was filed. West Virginia has "adopted the view that privity does not automatically arise from the parent-child relationship." *W. Va. Hum. Rts. Comm'n,* 618 S.E.2d at 470. Instead, "the

---

[18] Plaintiffs argue that res judicata cannot apply because none of the Plaintiffs in either lawsuit signed the Settlement. Pls. Opp'n Woloshin at 7. But this argument is a non-sequitur, as regardless of who signed the Settlement, it was approved by the court and the Second Lawsuit was eventually dismissed with prejudice. *See Rowe v. Grapevine Corp,* 527 S.E.2d 814, 825 (W. Va. 1999) (rejecting argument that plaintiffs' "lack of direct involvement in the settlement negotiations combined with their non-signatory status to the [settlement] agreement" would defeat res judicata).

[19] So too were the nominal Defendants the Tierney Corporation and the Leatherwood Company, and also Duane Morris LLP, but the Court has dropped Duane Morris LLP as a defendant.

key consideration for its existence is the sharing of the same legal right by parties allegedly in privity." *Id.* at 469.

The Court finds privity because the interests of these three defendants and their parents are very closely aligned. Peyton Tierney inherited his director positions and Executive Committee role—after a period where it was held by his mother, Patricia Tierney—from previous defendant Matt Tierney. Am. Compl. ¶¶ 17, 31. Ms. de Wet directly replaced her mother, and previous defendant, Ann Tierney Smith as director and Executive Committee member, and while it is unclear who Laurence Smith replaced as director, he is also the son of Ann Tierney Smith. *Id.* ¶¶ 17, 19, 29–30. The face of the complaint equates the current defendants to their parents, stating that the "children of Ann Tierney Smith and Matt Tierney have continued the legacy of self-dealing started by their parents." *Id.* ¶¶ 17, 19 (the alleged wrongful conduct was committed "in favor of Ann Tierney Smith, Matt Tierney, and their families"). Plaintiffs also plead that "both Ms. de Wet and Mr. Laurence Smith have or will benefit financially from the horse farm transaction (indeed, with Ann Tierney Smith's passing, her two children stand to benefit from an inheritance that includes the $4 million in ill-gotten gains of the horse farm transaction)." *Id.* ¶ 76. Given how closely Plaintiffs identify these three current defendants with prior defendants, alleging they have the same financial interests concerning the same wrongful conduct, the Court is comfortable finding that Peyton Tierney, Ms. de Wet, and Laurence Smith are in privity with their respective parents as defendants to the Second Lawsuit.[20]

---

[20] The parties devote attention to a red herring argument that these Defendants would be in privity because they "are simply the directors who replaced those named in the Second Lawsuit in West Virginia." Woloshin Mot. at 20. Plaintiffs correctly answer that Defendants offer no supporting case law for the proposition that directors are necessarily in privity with their predecessors. However, this action concerns not only successive directors, but successive

2. The Third Element is Satisfied for the Claims Against the Estate of Ann Tierney Smith and

Most Claims Against Mr. Woloshin

Most, but not all, of the claims in this lawsuit are "either . . . identical to the cause[s] of action determined in the prior action or must be such that it could have been resolved, had it been presented, in the prior action." *Blake*, 498 S.E.2d at 44.  In particular, Counts I through VI are little more than an attempt to relitigate the 2009 horse-farm transaction that was resolved in the Second Lawsuit. *Compare* Am. Compl., *with* Second Lawsuit Compl.  Again, that lawsuit has been settled and dismissed with prejudice. *See* Am. Unopposed Mot. Voluntary Dismissal; Order Dismissing Appeal.  Plaintiffs cannot try to reframe those claims to bring them into a court yet another time.

Plaintiffs urge that the fraudulent concealment exception to res judicata protects these counts from dismissal. Pls. Opp'n Woloshin at 10.  Under West Virginia law and res judicata principles generally, "an exception to the preclusion of claims that previously could have been determined exists where the party bringing the subsequent lawsuit claims that fraud, mistake, concealment, or misrepresentation by the defendant of the second suit prevented the subsequent plaintiff from earlier discovering or litigating his/her claims." *Blake*, 498 S.E.2d at 49.  Plaintiffs do not show such fraudulent concealment here.

Plaintiffs argue that until they received a copy of the Appraisal in 2019, they lacked actual knowledge of the actual value of the horse farm or the misrepresentations made about that value by Mr. Woloshin. Pls. Opp'n Woloshin at 34–35.  They also state that they lacked inquiry notice and had "no knowledge of the injury to the Companies or any evidence of wrongdoing."

---

directors who have a close family relationship and shared financial interests with their predecessors.

*Id.* at 35.  But even a quick analysis shows that Plaintiffs cannot say they were somehow unaware of the alleged impropriety surrounding the horse-farm transaction and valuation.  While claiming they had "no way of knowing, or even suspecting that Mr. Woloshin was misrepresenting the contents of the Appraisal," Plaintiffs discuss how Defendants "actively refused" their "multiple requests for the Appraisal over a period of nearly a decade."  *Id.*  While this fact alone may not be enough to show awareness, Plaintiffs eventually responded to this alleged stonewalling with the Second Lawsuit in January 2018, which alleged that Defendant Woloshin never shared with "[t]he Tierney Corporation or its Board any proof of the valuation of President [Ann Tierney] Smith's property being worth $4.6 million," and that the horse-farm transaction was an "unconscionable, self-serving transaction."  Second Lawsuit Compl. ¶¶ 64, 67.  The fraudulent concealment argument is untenable.

Counts I through VI are only asserted against Mr. Woloshin and the Estate of Ann Tierney Smith (Counts V and VI).  Am. Compl. ¶¶ 85–119.  Pursuant to the above analysis, the Court finds that all three elements of res judicata have been met and therefore DISMISSES Counts I through VI.

The Court cannot find the same for Counts VII and VIII.  Both counts are asserted against Peyton Tierney, Ms. de Wet, and Laurence Smith based on events that occurred *after* the filing of the Second Lawsuit in 2018; specifically, the alleged failure to disclose material information to shareholders regarding the Second Lawsuit.[21]  Am. Compl.  ¶¶ 120–28.  While these events did occur while the Second Lawsuit was still ongoing, "[r]es judicata does not bar parties from bringing claims based on material facts that were not in existence when they brought the original suit."  *Apotex, Inc. v. FDA,* 393 F.3d 210, 218 (D.C. Cir. 2004) (citation

---

[21] Count VII is also asserted against Mr. Woloshin.

omitted); *see also Morgan v. Covington Twp.*, 648 F.3d 172, 177 (3d Cir. 2011) (noting that at least six circuits have adopted a "bright-line rule that res judicata does not apply to events post-dating the filing of the initial complaint") (citation omitted).  However, while Counts VII and VIII are not precluded by res judicata, that does not mean they survive the motion to dismiss.

### D.  The Settlement Agreement Precludes the Remaining Counts.

While the principles of res judicata and the Settlement Agreement are closely related, they are analytically distinct.  Res judicata applies solely from the Second Lawsuit being dismissed with prejudice; the Settlement Agreement goes further and spells out a broader set of claims that are to be released.  *See* Order Dismissing Appeal; Settlement Agreement.  The Court's res judicata analysis has already resolved most claims against Mr. Woloshin and all claims against the Estate of Ann Tierney Smith.  Still, Counts VII and VIII against Peyton Tierney, Ms. de Wet, and Laurence Smith, and only Count VII as to Mr. Woloshin, remain.  *See* Am. Compl.  ¶¶ 120–28.  And so the Court turns to the terms of the Settlement Agreement.

The Settlement Agreement is a contract subject to ordinary contractual interpretation. *See Sanson v. Brandywine Homes, Inc.*, 599 S.E.2d 730, 734 (W. Va. 2004).  West Virginia "favors and encourages the resolution of controversies by contracts of compromise and settlement rather than by litigation; and it is the policy of the law to uphold and enforce such contracts if they are fairly made and are not in contravention of some law or public policy." *Acord v. Chrysler Corp.*, 399 S.E.2d 860, 860 (W. Va. 1990) (citations omitted).  Consequently, a settlement agreement should not be disregarded unless there is clear and convincing proof of "accident, mistake or fraud in making the same."  *Burdette v. Burdette Realty Improvement, Inc.*, 590 S.E.2d 641, 645 (W. Va. 2003).

The Settlement Agreement expressly released "any and all . . . claims . . . known or unknown . . . in anyway growing out of, resulting from, or relating to the claims which were or could have been asserted in" the First and Second Lawsuits, as well as the current action. *See* Settlement Agreement at 3, 5. The Settlement Agreement's release applies to "all of the Companies' current and former officers and directors," and Peyton Tierney, Ms. de Wet, and Laurence Smith were all on the Board on February 23, 2022, when the Settlement was signed. *See id.* at 5. This broad release clearly precludes Peyton Tierney, Ms. de Wet, and Laurence Smith from liability under Counts VII and VIII.[22] While mostly redundant given the Court's res judicata analysis, except for Mr. Woloshin and Count VII, the Settlement Agreement also releases Mr. Woloshin and the Estate of Ann Tierney Smith from all claims. *See id.*

Rather than arguing that the language of the Settlement Agreement does not release the claims in this action—it is difficult to see how they could—the Plaintiffs instead argue that this Court "should completely disregard the settlement agreement and any purported release therein because the settlement agreement was both unfairly made and in violation of West Virginia law." Pls. Opp'n Woloshin at 11. Plaintiffs argue that the Settlement Agreement was not authorized by the shareholders or the Board; that it was also not approved by the shareholders or the Board; that it was not negotiated, approved, or agreed to by the Plaintiffs; that it violates the Companies' bylaws; and that it violates West Virginia law regarding conflicting interest transactions.[23] *Id.* None of Plaintiffs' arguments persuade the Court to cast aside the Settlement Agreement.

---

[22] The Court does not imply that a settlement agreement can altogether insulate directors from removal, but in this action, the Settlement Agreement releases Peyton Tierney, Ms. de Wet, and Laurence Smith from any of the alleged predicate wrongdoing that forms the basis for removal in Count VIII. *See* Settlement Agreement at 3, 5.

[23] To facilitate a concise analysis, the Court rearranges these arguments from their numbering in Plaintiffs' briefing.

The Court disagrees that the Settlement Agreement was not authorized by the shareholders or the Board.  At the May 30, 2020, shareholder meeting, the shareholders approved the following language:

> RESOLVED THAT it is not in the Corporation's best interests to pursue the claims alleged in *Tierney, et al. v. Tierney, et al.*, No. 18-C-90 (Cir. Ct. Kanawha Cnty., W. Va.); therefore, plaintiffs' demand is hereby rejected and the Board of Directors shall take all actions necessary to secure dismissal of said litigation.

*See* Letter to Tierney Corp. S'holders on May 20, 2020, Ex. 1 to Pls. Resp. Defs. Notice Suppl. Auth., ECF No. 39-1.[24]  This resolution is directed at dismissing the Second Lawsuit, but it also authorizes "all actions necessary" to secure dismissal of said litigation.  *Id.*  Releasing other claims not asserted in the Second Lawsuit, including those in this case, falls within this mandate.

Acting pursuant to the shareholder authorization, the Board adopted the resolution and developed the Settlement Agreement that resolved the Second Lawsuit and released any related claims.  Settlement Agreement at 3, 5.  Plaintiffs allege that they were not consulted in the negotiation and drafting of this Agreement.  Pls. Opp'n Woloshin at 13.  But regardless, Plaintiffs are inaccurate in their description of the Settlement Agreement as "underhanded backroom dealing" solely among the Defendants in this action.[25]  *Id.*  The terms of the Settlement Agreement brought hundreds of thousands of dollars in benefit for the Companies

---

[24] Although this language is not quoted in the Amended Complaint, the letter is referenced and described.  Am. Compl. ¶ 49.  Both parties seem comfortable relying on this language for the purpose of resolving these motions to dismiss.  *See* Pls. Opp'n Woloshin at 12; Woloshin Reply at 10.

[25] Plaintiffs principally rely on a comparison to *Breswick & Co. v. Briggs,* 135 F. Supp. 397, 400 (S.D.N.Y. 1955) to prove this point.  But that case is over 70 years old, from another jurisdiction, and factually distinct.  Quite different from the already adjudicated Settlement Agreement here, the federal court in *Breswick* overturned a settlement before any state court had approved the settlement.  *Id.* at 405.  In addition, the Plaintiffs here also filed the Second Lawsuit and participated in the settlement approval process, whereas *Breswick* involved an attempt to bind plaintiffs to settlement terms that they had no input on and that arose from a separate proceeding.

and led to Mr. Woloshin's resignation.  *See infra* at 10.  Even more, the Settlement Agreement

was approved by the West Virginia Business Court Division.  Final Settlement Approval at 1.

Indeed, as part of that approval, Plaintiffs had an opportunity to object to the Settlement

Agreement.  Pursuant to the process for judicial approval of derivative settlements mandated by

West Virginia Rule of Civil Procedure 23.1, every shareholder was notified of the proposed

Settlement.  Final Settlement Approval ¶¶ 16–19.  These shareholders were invited to object.

While Plaintiffs took that invitation, no other shareholders objected to the Settlement or

otherwise participated at the final fairness hearing.  *Id.* ¶ 18; *see generally* Tr. Proceedings on

January 11, 2022, Ex. 7 to Woloshin Mot., ECF No. 57-8.  After analyzing the terms of the

Settlement Agreement—both at a preliminary and a final hearing—the West Virginia court

approved it as "fair, reasonable and adequate."  Final Settlement Approval ¶ 34.  Afterward,

Plaintiffs appealed the court's approval, but voluntarily dropped that appeal.  Am. Unopposed

Mot. Voluntary Dismissal.

So while Plaintiffs may now argue that the Settlement was improperly approved, they

have already abandoned their chance to press that argument.  Under West Virginia law,

> "[c]ollateral estoppel will bar a claim if four conditions are met: (1) The issue previously
> decided is identical to the one presented in the action in question; (2) there is a final
> adjudication on the merits of the prior action; (3) the party against whom the doctrine is
> invoked was a party or in privity with a party to a prior action; and (4) the party against
> whom the doctrine is raised had a full and fair opportunity to litigate the issue in the prior
> action."[26]

*Bruce McDonald Holding Co. v. Addington, Inc.*, 825 S.E.2d 779, 789 (W. Va. 2019).

All four conditions are met here.  The issue—the validity of the Settlement Agreement—

is the same, there is no dispute that there was a final adjudication, the Plaintiffs in this action

---

[26] Much as res judicata is also known as claim preclusion, collateral estoppel is also
known as issue preclusion.

were either parties or in privity to parties to the prior action, and the Plaintiffs litigated validity in the Settlement Approval process before deciding to drop their appeal.[27]  With this history in mind, the Court sees no occasion to consider Plaintiffs' current assertions that the Settlement Agreement violated West Virginia law.[28]  Neither will it consider the Plaintiffs' sparse claim that the Agreement "also violates the Companies' bylaws."  *See* Pls. Opp'n Woloshin at 16.  Simply put, the Court will not cast aside the determinations of the West Virginia court just because Plaintiffs apparently preferred to make their case in this jurisdiction instead.[29]  Because the Settlement Agreement releases all claims against the Defendants here, and Plaintiffs withdrew their efforts to challenge court approval of that Settlement Agreement, leading to a final judgment on the validity of that agreement, the Court DISMISSES all remaining Counts.

### E.  The Court Need Not Address the Remaining Arguments.

The Defendants also assert several other grounds for dismissal, arguing that the Plaintiffs do not satisfy Federal Rule of Civil Procedure 23.1's requirements for shareholder derivative litigation, that the Amended Complaint fails to state a claim upon which relief can be granted, that the Plaintiffs have failed to allege fraud with specificity under Rule 9(b), and that Counts I

---

[27] Unlike res judicata, collateral estoppel does not require the parties on both sides to be a party or in privity to a prior party in a prior action, but only the party against whom the doctrine is invoked.  *See Blonder-Tongue Lab'ys, Inc., v. Univ. of Ill. Found.*, 402 U.S. 313, 328–29 (1971).  As discussed above, *see infra* at 25–26, all the Plaintiffs were either parties to the Second Lawsuit or had their interests sufficiently represented.

[28] Specifically, Plaintiffs assert that the Settlement Agreement is void or voidable under West Virginia Code § 31D-8-860, which governs contracts between a corporation and its directors or officers.  *See* Pls. Opp'n Woloshin at 14.

[29] The Constitution commands that this Court give "full faith and credit" to the judicial proceedings of every state.  U.S. Const. art. IV, § 1.  So does federal statute.  *See Matsushita Elec. Indus. Co. v. Epstein,* 516 U.S. 367, 373 (1996) ("The Full Faith and Credit Act mandates that the 'judicial proceedings' of any State 'shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of such State . . . from which they are taken.'" (quoting 28 U.S.C. § 1738)).

through VI are barred by the applicable three-year statute of limitations.  *See, e.g.*, Woloshin Mot. at 26, 34–42; Tierney Smith Mot. at 6, 9.  Because the Court already has found that all claims must be dismissed due to res judicata and the Settlement Agreement, it need not address these remaining arguments.  *See, e.g.*, *RSM Prod. Corp. v. Freshfields Bruckhaus Deringer U.S. LLP,* 800 F. Supp. 2d 182, 188 n.4 (D.D.C. 2011), *aff'd,* 682 F.3d 1043 (D.C. Cir. 2012) ("Given resolution of the pending motion on grounds of res judicata, the Court need not consider the defendants' other arguments."); *Polsby v. Thompson*, 201 F. Supp. 2d 45, 52 (D.D.C. 2002) (same).

## V.  CONCLUSION

For the foregoing reasons, the Defendants' motions to dismiss (ECF No. 54, ECF No. 55, ECF No. 56, ECF No. 57) are **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 29, 2023                          RUDOLPH CONTRERAS
                                                    United States District Judge